# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------------x
                                            :
ARTISAN MANUFACTURING                       :
CORPORATION,                                :
                                            :   07-cv-11278 (WHP)
            Plaintiff,                      :
                                            :
      v.                                    :   FILED VIA ECF
                                            :
ALL GRANITE & MARBLE                        :
CORPORATION,                                :
                                            :
            Defendant.                      :
                                            :
                                            :
-----------------------------------------------------------------x
```

## DEFENDANT ALL GRANITE & MARBLE CORPORATION'S RESPONSE TO PLAINTIFF'S MOTION FOR A PRELMINARY INJUNCTION

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ...............................................................................2

ARGUMENT ..................................................................................................6

I.     STANDARD FOR A PRELIMINARY INJUNCTION ....................................6

II.    ARTISAN IS UNLIKELY TO SUCCEED ON THE MERITS
       OF ITS ALLEGATIONS..........................................................................6

       A.     The "Bait and Switch" Allegations are Nothing
              More than a Red Herring ..........................................................6

       B.     Artisan is Unlikely to Succeed with its False
              Advertising Claim.....................................................................8

       C.     Artisan is Unlikely to Succeed with its Trademark Claims.................10

       D.     Artisan is Unlikely to Succeed with its False Designation
              of Origin Claim.......................................................................12

              1.     Artisan's Fleur-de-Lis Logo is not a Valid Mark
                     Entitled to Protection ....................................................12

              2.     Usage of AGM's Crown logo is Not Likely to
                     Cause Confusion .........................................................15

                     a.     Artisan's Fleur-de-Lis Logo is Weak ...........................15

                     b.     The Marks in Dispute are Dissimilar............................16

                     c.     The Products are not in Competitive Proximity .............17

                     d.     There is no Actual Confusion Between the Marks ..........17

                     e.     There is no Likelihood that Plaintiff Will Bridge
                            the Gap....................................................................20

                     f.     AGM Adopted its Mark in Good Faith..........................20

                     g.     Defendant's Products are of Sufficient Quality..............22

        h.     Consumers who Purchase AGM's Goods are Sophisticated ................................................................................23

        i.      Artisan has Failed to Satisfy any of the Polaroid Factors ......................................................................................23

III.   ARTISAN HAS FAILED TO DEMONOSTRATE IRREPARABLE HARM .............................................................................24

IV.   THE BALANCE OF HARDSHIPS FAVORS AGM ......................................................25

CONCLUSION..............................................................................................................25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995)........................................22

*Brennan's Inc. v. Brennan's Rest.*, 360 F.3d 125, 130 (2d Cir. 2004) ..........................................15

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*,
    348 F.Supp.2d 217, 250 (S.D.N.Y. 2004)......................................................................10

*Centaur Comms. Ltd. v. A/S/M/ Comms., Inc.*, 830 F.2d 1217 (2d Cir. 1987) ............................13

*D.D. ex rel. V.D. v. New York City Bd. Of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006)...............6, 24

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*
    314 F.3d 48, 57 (2d Cir. 2002)......................................................................................9

*Goshen v. Mutual Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324-25 (2002) ........................................7

*Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 581 (2d Cir. 1991).............................14

*Leider v. Ralfe,* 387 F.Supp.2d 283, 292 (S.D.N.Y. 2005) ............................................................7

*Lexington Management Corp. v. Lexington Capital Partners*,
    10 F.Supp.2d 271, 281 (S.D.N.Y. 1998)......................................................................14

*IMAF, S.P.A. v. J.C. Penney Co., Inc.,* 806 F.Supp. 449, 455 (S.D.N.Y. 1992) ..........................15

*Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005)........16

*Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir. 2004).......................15

*Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961)................................15

*Savin Corp. v. Savin Group*, 391 F.3d 439, 456 (2d Cir. 2004) ...........................12, 16, 17, 20, 23

*SLY Magazine, LLC v. Weider Publications L.L.C.*,
    No. 05-Civ-3940, 2007 WL 4577389 (S.D.N.Y. 2007) ............................................15

*Star Industries, Inc. v. Bacardi & Company Limited*,
    412 F.3d 373, 381 (2d Cir. 2005)......................................................12, 15, 16, 20, 22

*Streetwise Maps, Inc. v. Vandam Inc.*, 159 F.3d 739, 745 (2d Cir. 1998)........................17, 20, 23

*Tough Traveler Ltd. v. Outbound Products*, 60 F.3d 964 (2nd Cir. 1995)...................................24

*Random House Inc. v. Rosetta Books LLC*, 283 F.3d 490, 492 (2d Cir. 2002) ............................25

*W.W.W. Pharma. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993)…………………… 13, 14

## OTHER AUTHORITIES

15 U.S.C. § 1125(a)(1)(A) .................................................................................................6,  12

15 U.S.C. § 1125(a)(1)(B) ..............................................................................................6, 8, 9

15 U.S.C. § 1114(1)(a)....................................................................................................6, 10

15 U.S.C. § 1127 ................................................................................................................11

NY General Business Law §§ 349, 350...............................................................................6, 7

F.R.E. 801 .........................................................................................................................18

F.R.E. 802 .........................................................................................................................18

Defendant All Granite & Marble Corporation ("AGM") respectfully submits this Response, together with the accompanying declarations of Robert Deja, Sebastian Sroka, and Jon Chiodo, Esq., in opposition to Plaintiff Artisan Manufacturing Corporation's ("Artisan") Motion for a Preliminary Injunction.

## PRELIMINARY STATEMENT

This is a case about free promotional sinks. AGM, as a fabricator and installer of marble and granite products, offers its customers a free promotional sink upon the purchase of a countertop. In the past, AGM purchased its promotional sinks from Artisan, but now purchases such sinks from an alternative source. Artisan, which is clearly displeased with this loss of business, is now attempting to accomplish in Court what it was unable to accomplish in the marketplace.

AGM first became aware of Artisan's current allegations when it received a cease and desist letter from Artisan on December 17, 2007. AGM responded to Artisan's letter within three days of receipt. AGM's response was prepared through information obtained from the headquarters office in Ridgefield Park, which at that time was unaware that a single Artisan sink remained on display in the South Plainfield location. This sink was nothing more than residual carryover from the time period when AGM purchased its free promotional sinks from Artisan. In fact, the Artisan logo on such sink was not even visible because it had been covered by a tag.

AGM did not become aware of the lawsuit (which was filed on December 14, 2007 - the same day that Artisan sent its cease and desist letter) until January 8 when it received a copy of such suit in the mail. Apparently, Artisan's attorneys chose to serve process through the New York Secretary of State (rather than serve AGM or AGM's attorneys). It was not until January 9, 2008 that Artisan's attorneys finally made known the fact that an Artisan sink remained on

display in the South Plainfield location.  AGM removed the Artisan sink the following day, i.e.,

on January 10, and advised Artisan's attorneys in writing that such sink had been removed and

that the basis for an Order to Show Cause filing no longer existed.  Despite knowing of the fact

that the sink had been removed, and despite the fact that its moving papers are based in large part

on the existence of such sink, Artisan proceeded with filing its papers.  Despite repeated attempts

by AGM to resolve this matter since that time, Artisan continues to view this case as a potential

windfall, and continues to pursue its request for a preliminary injunction.

However, as discussed hereinbelow, Artisan has failed to demonstrate a likelihood of

success on the merits of its claims.  Simply put, Artisan's moving papers fail to set forth

sufficient evidence to support the claims upon which its request is based, nor has the expedited

discovery uncovered any new credible/admissible evidence.  Additionally, the balance of the

hardships weighs strongly in favor of AGM in view of AGM's inventory of sinks (which bear its

crown logo), and will be needed to honor the millions of "free sink" coupons that AGM has

already placed in commerce.  Finally, Artisan has failed to demonstrate that it will suffer

irreparable harm should AGM be permitted to continue distributing its sinks.  In this regard,

Artisan delayed more than six months from the time it allegedly first learned of AGM's activity

until the time it filed the present motion.  Accordingly, the preliminary injunctive relief sought

by Artisan should be denied.

## **STATEMENT OF THE FACTS**

AGM is a well-known fabricator and installer of marble and granite products, particularly

specializing in countertops.  (Deja Decl. ¶2).  It has three locations in New Jersey and

Pennsylvania, where it has experienced tremendous success and has become known as one of the

leaders of the granite countertop industry.  (Deja Decl. ¶2).  To acquire and maintain this

superiority, AGM extensively advertises on the internet and in trade publications, home

mailings, television, billboards and others.  (Deja Decl. ¶3).  In 2007, AGM spent nearly 2.5

million dollars on advertising alone.  (Deja Decl. ¶3).  Its internet site, www.marble.com, has

also experienced tremendous success, generating a great number of user hits.  (Deja Decl. ¶4).

AGM prides itself on its high-quality services and products, and takes great efforts to ensure that

the customer is always satisfied with his or her purchase.  (Deja Decl. ¶5).

     A granite countertop installation generally costs about $2,000 to over $5,000.  (Deja

Decl. ¶8).  AGM does not sell sinks to its customers; in fact, sinks are given to customers for free

as a promotion.  (Deja Decl. ¶9).  Such practice of providing free sinks to customers with the

purchase of a granite countertop is common in the industry, as granite countertop retailers do not

consider the sale of sinks important to their core business.  (Deja Decl. ¶11).

     AGM has a particular process for handling the sale of a granite countertop.  In fact,

Artisan's own private investigator went through the AGM sales process.  (Chiodo Decl. ¶11).

When a potential customer enters one of AGM's showrooms, the customer is engaged by a sales

representative.  (Deja Decl. ¶14).  The customer and the sales representative discuss what the

customer is looking for in a countertop.  (Deja Decl. ¶14).  After the two discuss the needs of the

customer, the customer is given a range of price quotes for a countertop installation.  (Deja Decl.

¶14).  Once the quote is obtained, the customer is allowed to visit the granite display area where

he or she can look at literally hundreds of samples of granite countertops.  (Deja Decl. ¶14).

This process includes a review by the customer of stone samples.  Such review typically takes

from twenty minutes to several hours, since customers are extremely keen on selecting desired

colors, particularly in view of the anticipated level of expenditure.  (Deja Decl. ¶15).  AGM

offers over 1,000 different colors and styles from which the customer may select.  (Deja Decl.

¶15).  Based on the samples in the showroom, the customer selects one or more stone colors or

styles that he or she may be interested in for installation.  (Deja Decl. ¶16).  To better appreciate

the appearance of the selected stone, the customer is walked through a stoneyard or warehouse to

see full-size slabs of the selected stones.  (Deja Decl. ¶16).  Each location has a stoneyard or

warehouse which contains thousands of stone slabs on site.  (Deja Decl. ¶16).

Once the specific stone selection is made, various add-ons are discussed, such as

countertop removal and the installation of a sink.  Where a customer is not installing a sink that

has been separately purchased (i.e., not acquired from AGM), a customer is notified that a sink

may be obtained from AGM.  (Deja Decl. ¶18).  The representative may explain to the customer

that there are three basic styles of stainless steel sinks offered by AGM: rectangular, double

basin; D-shaped single basin; and D-shaped double basin.  (Deja Decl. ¶19).  The customer may

present a "free sink" coupon, and the customer will receive a free sink.  In fact, in instances

where the customer does not have a coupon, such as happened to Artisan's investigator, the sales

representative will either inform the customer of the coupon, or the sales representative may

simply give the customer a free sink.  (Deja Decl. ¶19).  The customer may then choose a style of

free sink for the installation.  (Deja Decl. ¶19).  In fact, only approximately 40% of customers

choose to receive the free sink from AGM.  (Deja Decl. ¶20).  The brand of sink is generally

never discussed, and in fact, the sales representative may not know the exact brand of sink that

will be installed.  (Deja Decl. ¶20).

After the quote is established, the customer is informed to call AGM when he or she is

ready for installation. (Deja Decl. ¶21).  After calling, a templator will visit the installation

location to obtain exact measurements, confirm specifics of the order, and to evaluate any

potential problems.  (Deja Decl. ¶21).  The information collected by the templator is used to

generate a purchase order with an exact and final charge. Additionally, the obtained details are used to generate a template necessary to form the countertop. (Deja Decl. ¶21). Once formed, the countertop is installed along with any provided or free sink. (Deja Decl. ¶21).

Artisan is the owner of one federally registered trademark registration, U.S. Trademark Reg. No. 2,964,024, which is directed to the word "ARTISAN". The fleur-de-lis mark that Artisan asserts is not embodied in a federally registered trademark. As such, the asserted Artisan fleur-de-lis mark is, at best, a common law trademark. In fact, given the high number of fleur-de-lis marks in use in the United States and uncertainties surrounding common law marks, the scope of protection of the common law Artisan fleur-de-lis marks is unknown.

From 2003 to 2006, AGM purchased sinks from Artisan for distribution to its customers. (Deja Decl. ¶28). No formal agreement was ever entered into between AGM and Artisan regarding any distributorship arrangement. (Deja Decl. ¶29, Chiodo Decl. ¶10). Further, AGM has never participated in any qualification procedure to be an "authorized dealer" of Artisan's products. According to the testimony of Alex Han, and contrary to his earlier sworn declaration, Artisan did not terminate the relationship with AGM until December 14, 2007, when it sent its cease and desist letter to AGM. (Chiodo Decl. ¶23). This testimony tends to substantiate the fact that Artisan's sales representative was still pursuing AGM as late as August of 2007 to sell AGM a new line of sinks. (Chiodo Decl. ¶13). Artisan has been unable to produce any documents evidencing the alleged distributorship agreement, despite AGM's repeated requests. (Chiodo Decl. ¶14).

After purchasing Artisan's sinks for a period of time for free distribution, AGM decided to directly purchase its own sinks, with the last purchase of Artisan sinks on June 2, 2006. (Deja Decl. ¶28). Since this date, AGM has been distributing its own sinks. A portion of these sinks

have been unbranded (i.e., no logo) and a portion bears an AGM-created logo: the AGM Crown

Logo. (Deja Decl. ¶32). The AGM Crown Logo is a three-pronged crown having jewel-shaped

portions, and further incorporating fancy swirled designs emanating from the base of the crown.

(Deja Decl. ¶37). AGM uses this logo on its sinks, which are provided without charge as part of

its "free sink" promotion. (Deja Decl. ¶38).

## ARGUMENT

I.    Standard for a Preliminary Injunction

In order to secure a preliminary injunction, the moving party must demonstrate (1)

irreparable harm without the injunction, and (2) either (a) likelihood of success on the merits or

(b) sufficiently serious questions going to the merits of the case to make it a fair ground for

litigation and balance of hardships tipping decidedly in the moving party's favor. *D.D. ex rel.*

*V.D. v. New York City Bd. Of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006).

II.   Artisan is Unlikely to Succeed on the Merits of Its Allegations

Although Artisan's Complaint includes 10 different Counts, its request for a preliminary

injunction is based on more limited grounds: 1) Count Four of the Complaint (False Advertising

under 15 U.S.C. § 1125(a)(1)(B) (see § I.B. of Artisan's Memorandum), and 2) Counts One,

Two and Three of the Complaint (Trademark Counterfeiting under 15 U.S.C. § 1114(1)(a),

Trademark Infringement under 15 U.S.C. § 1114(1)(a) and False Designation of Origin under 15

USC § 1125(a)(1)(A)) (see § I.C. of Artisan's Memorandum).

A.    The "Bait and Switch" Allegations are Nothing More than a Red Herring

As an initial matter, AGM will dispose of Artisan's "Bait and Switch" allegations. These

allegations appear throughout Artisan's moving papers, and are purportedly based upon alleged

violations of NY General Business Law §§ 349, 350. However, there can be no doubt but that

the real reason such claims are included in the Complaint and that the term "Bait and Switch" is repeatedly referred to in the moving papers (even though the present request is not based on such allegations) is that Artisan believes that such allegations tend to "color" the case in its favor, while also providing a potential statutory basis for recovery where damages could not otherwise be established.

The law is clear, however, that claims arising under NY General Business Law §§ 349, 350 must be based upon conduct occurring in the State of New York. *Leider v. Ralfe,* 387 F.Supp.2d 283, 292 (S.D.N.Y. 2005)(citing *Goshen v. Mutual Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324-25 (2002)).  Here, there is simply no evidence (nor even an allegation) that the alleged deception occurred in New York.  In this regard, Artisan's moving papers refer to "a 'bait and switch' scheme whereby [AGM] entices potential customers into contracting for its services by promising that it will install a high quality ARTISAN brand sink."  According to Artisan, this alleged deception occurred at the point of sale, i.e., in AGM's showrooms, none of which are located in New York.

More to the point, AGM has not and does not engage in any deceptive practices.  In fact, a careful reading of the statement of Artisan's private investigator, Allison Davies, confirms that AGM delivered the <u>exact</u> sink that she ordered.  (Chiodo Decl. ¶11).  Ms. Davies's statement discusses the placement of an Artisan sink in the AGM showroom, followed by the delivery and installation of a non-Artisan sink.  However, Ms. Davies did not order the displayed Artisan sink – in fact, she ordered an AGM sink, model number 590-529.  (Chiodo Decl. ¶11).  This was the exact sink that was delivered and installed by AGM.  There was no "switching" of sinks.

In particular, Ms. Davies entered the AGM showroom and asked a salesperson if the ***double***-basin D-shaped sink was an Artisan sink, which it was.  The salesman said that it was an

Artisan sink, a true statement.  However, Ms. Davies did not order that sink – she returned three weeks later and ordered a *single*-basin D-shaped sink, AGM model number 590-529, which she knew was not an Artisan sink.  The sink did not have an Artisan fleur-de-lis logo on it, and based upon her own testimony, she had been trained to look for and recognize Artisan's fleur-de-lis logo.  (Chiodo Decl. ¶11).  In this regard, Ms. Davies' report includes a photograph of the AGM 590-529 sink with the caption "generic 18-gauge sink".  (Chiodo Decl. ¶11).  Thus, the sink Ms. Davies ordered was in fact the sink that was installed.  No switching occurred.

Finally, Artisan has failed to show any actions of AGM that can reasonably be considered to "bait" a customer into its showroom.  Artisan has not been able to produce any advertising by AGM that promotes or even refers to Artisan's brand of products.  Moreover, it has been established that AGM's salespeople are paid a straight salary – not a commission.  (Chiodo Decl. ¶22).  In other words, the AGM salespeople have no financial motivation to act in the manner suggested by Artisan.  Thus, Artisan's allegation that AGM "baits" customers by the lure of a free Artisan sink is completely without basis.

B.    Artisan is Unlikely to Succeed with its False Advertising Claim

As mentioned, Artisan's request for a preliminary injunction is based, in part, upon its allegation of false advertising under 15 U.S.C. §1125(a)(1)(B).  However, the only conduct complained of by Artisan and referred to in its moving papers are the alleged oral misrepresentations made by AGM's salespeople in its showrooms.  There are no allegations, nor could there be, of any print or media advertisements disseminated by AGM which refer in any way to Artisan, or its trademarks.

More recently, Artisan's regional sales manager, Joseph Amabile, while being deposed, suddenly recalled viewing certain white specification sheets and posters within AGM's

showrooms.  These specification sheets allegedly contained a reference to Artisan, but no fleur-de-lis, while the posters allegedly included an Artisan model number.  Mr. Amabile testified that he was unable to obtain a copy of the specification sheet, or to closely observe the poster. (Chiodo Decl. ¶20).

This testimony, however, is rather suspect, and should be given little weight by this Court.  To begin, it is rather odd that this testimony (which is arguably quite favorable to Artisan) was not mentioned in Artisan's moving papers, despite the fact that Mr. Amabile submitted a declaration and has been intimately involved in this case.  Additionally, it is hard to believe that Mr. Amabile, the regional sales manager for Artisan, would not have made a point of taking one of these allegedly infringing specification sheets from AGM's showroom during either of his two visits.  Finally, Mr. Amabile's emails and testimony reveal that his first visit to AGM's showroom occurred prior to June 26, 2007.  It is hard to imagine that Artisan would not have followed up on these "observations" by its regional sales manager until months later, when it sent its investigator into AGM showrooms in November of 2007.  In sum, this recently disclosed information is simply not credible.

In any event, even assuming, *arguendo*, that the alleged oral misrepresentations occurred, and that infringing specification sheets and posters existed in the showrooms, the Second Circuit has held that such conduct does not rise to the level necessary to support a claim of false advertising under 15 U.S.C. § 1125(a)(1)(B).  In particular, the Second Circuit held in *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc*. 314 F.3d 48, 57 (2d Cir. 2002) that defendants' actions must be "part of an organized campaign to penetrate the relevant marketplace" to qualify as "commercial advertising or promotion" under the Act.  *Id*.  An organized campaign to penetrate the relevant market generally consists of widespread dissemination within the relevant

industry. *Id*. This Court has found, on very similar facts, that making false oral representations and posting advertisements, such conduct occurring within defendant's offices, cannot be characterized as widespread dissemination or an organized campaign, and cannot support a false advertising claim under the Lanham Act. *Cartier, Inc. v. Four Star Jewelry Creations, Inc*., 348 F.Supp.2d 217, 250 (S.D.N.Y. 2004).

Artisan has therefore failed to demonstrate a likelihood of success on the merits with respect to its false advertising claim arising under the Lanham Act and, accordingly, its request for a preliminary injunction on these grounds must be denied.

C.     Artisan is Unlikely to Succeed with its Trademark Claims

Artisan's papers also rely upon both counterfeiting and trademark infringement under 15 U.S.C. § 1114(1)(a) in support of its request for a preliminary injunction. However, this statute is applicable only to registered trademarks. The sole registered trademark owned by Artisan is for the wordmark ARTISAN. Artisan does not have a registration for its fleur-de-lis logo. Thus, Artisan's claims under this statute can be based only upon alleged usage of the word ARTISAN.

In this regard, Artisan's moving papers refer to an Artisan sink displayed in AGM's South Plainfield showroom. This sink included the Artisan fleur-de-lis logo, but did not include the word ARTISAN, either on the sink or on any display material associated with the sink. Thus, the existence of the sink in AGM's showroom cannot support a claim under this statute. Moreover, Artisan has failed to present any credible/admissible evidence showing any usage by AGM of the word ARTISAN. As mentioned above, Artisan's regional sales manager revealed for the first time during his deposition that he recalls seeing a white specification sheet containing a reference to Artisan during his visit to AGM's showrooms in June of 2007. However, Artisan cannot substantiate this allegation.

10

More recently, Artisan provided AGM with a specification sheet allegedly obtained from one of AGM's customers which includes the word "Aristan" – not ARTISAN, and refers to a sink which does not correspond to any sink distributed by AGM. (Deja Decl. ¶¶23-25). Artisan has failed to establish any foundation for this document, and AGM cannot be expected to respond to unasserted and unknown allegations. In any event, it simply makes no sense to suggest that AGM would go to the trouble of making up "phoney" specification sheets to promote sinks it does not carry. (Deja Decl. ¶¶24-25).

Although not relevant to this analysis, it is worth noting that a plurality of ARTISAN marks already exist in the marketplace. (Chiodo Decl. ¶24). In fact, one of the largest sink manufacturers in the world, Franke of Switzerland, currently markets a Franke Artisan Sink, as well as Artisan accessories, in the United States. (Chiodo Decl. ¶24). Mr. Han's testimony that he was unaware of this particular sink is difficult to square with Artisan's repeated assertions concerning the strength of its brand. (Chiodo Decl. ¶23).

Finally, Artisan's attempt to describe this case as one involving "counterfeits" is without any merit, and is directly contrary to applicable law. In this regard, the Lanhan Act defines a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." . Here, there is simply no evidence, whatsoever, that AGM has used a "spurious mark", and Artisan's attempt to turn this matter into a "Canal Street" counterfeit case must be rejected.

Artisan has therefore failed to demonstrate that it has a likelihood of succeeding on the merits with respect to its trademark claims arising under the Lanham Act and, accordingly, its request for a preliminary injunction on these grounds must be denied.

D.    Artisan is Unlikely to Succeed with its False Designation of Origin Claim

To prevail on a claim for false designation of origin under 15 U.S.C. § 1125(a)(1)(A), the Plaintiff must show (1) that it has a valid mark that is entitled to protection and (2) that the use of Defendant's mark infringes or is likely to infringe the Plaintiff's mark. *Savin Corp. v. Savin Group*, 391 F.3d 439, 456 (2d Cir. 2004). As discussed, Artisan has failed to provide any credible and/or admissible evidence that AGM has ever used the word ARTISAN on or in connection with its promotional sinks. Accordingly, the only questions to consider with respect to Artisan's claim of false designation are 1) whether its unregistered fleur-de-lis logo is a valid mark entitled to protection under the Lanham Act, and 2) whether AGM's crown logo is likely to cause confusion with such mark.

1.    Artisan's Fleur-de-lis Logo is not a Valid Mark Entitled to Protection

An unregistered mark is entitled to protection under the Lanham Act if it would qualify for registration as a trademark. *Star Industries, Inc. v. Bacardi & Company Limited*, 412 F.3d 373, 381 (2d Cir. 2005). To qualify for registration a mark must be sufficiently "distinctive" to distinguish the registrant's goods from those of others. *Id*. Such distinctiveness may be demonstrated in either of two ways. The mark may be "inherently distinctive" if its intrinsic nature serves to identify its particular source. *Id*. Alternatively, even if not inherently distinctive, the mark may be distinctive by virtue of having acquired a "secondary meaning" in the minds of consumers. *Id*.

Artisan's unregistered fleur-de-lis logo is not entitled to protection under the Lanham Act because it would not qualify for registration as a trademark. In particular, the fleur-de-lis logo is not "sufficiently distinctive" as to distinguish its goods from the goods of others, nor has it acquired secondary meaning. While stylized shapes may have the requisite distinctiveness,

12

Artisan's fleur-de-lis mark is merely a commonplace and well-known design. This design is seen throughout all areas of commerce, including sinks and fixtures that are currently used today. (Deja Decl. ¶46, Chiodo Decl. ¶24). In fact, a *Wikipedia.com* entry exists for "fleur-de-lis", clearly demonstrating its lack of distinctiveness. (Deja Decl. ¶47). Such a common shape as that of Artisan's fleur-de-lis mark, in this very crowded field, cannot be an inherently distinctive mark.

Moreover, Artisan's fleur-de lis logo has not acquired secondary meaning in the minds of consumers. Secondary meaning is generally considered "the extent to which the public has come to identify the mark with a particular product." *W.W.W. Pharma. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993). This Court has identified several factors which may be used to assess secondary meaning: advertising expenditures, consumer studies linking the mark to the source, sales success, unsolicited media coverage, and the length and exclusivity of use. *Centaur Comms. Ltd. v. A/S/M/ Comms. Inc.*, 830 F.2d 1217 (2d Cir. 1987).

Although Artisan has blanketly asserted that its fleur-de-lis logo has acquired secondary meaning, Artisan has failed to introduce sufficient evidence to establish even a *prima facie* showing of secondary meaning. Artisan's moving papers state that it has spent $400,000 in advertising over a period of five years. To suggest that this minimal amount of spending has resulted in recognition of the fleur-de-lis logo strains credibility. By comparison, AGM has expended approximately 2.5 million dollars on advertising over the last year alone. (Deja Decl. ¶3). More importantly, Artisan has failed to demonstrate how much of this advertising was actually spent on promoting the fleur-de-lis logo, as compared to the wordmark ARTISAN. The fleur-de-lis logo has been in use since August 21, 2003, less than four-and-half years. (Chiodo Decl. ¶25). Clearly, the advertising expenditures over five years have not been solely directed to

13

the fleur-de-lis.  In addition, until its current dispute with AGM, Artisan did not even bother attempting to register this logo.  Moreover, on two of the websites referred to in the Han declaration (www.irawoods.com and www.uskitchenware.com), many of the Artisan sinks do not appear to bear the fleur-de-lis mark.  (Chiodo Decl. ¶17-18).  Although Mr. Han testified that the logo appears on the sink, a customer viewing the web page does not see the fleur-de-lis logo, either on the image of the sink or in the description associated with such sink.  (Chiodo Decl. ¶17-18).

Moreover, a glimpse at internet usage statistics shows just how insignificant the Artisan mark is, being significantly lower than AGM as well as three other sink manufacturers (Kohler, Franke, and Elkay USA).  (Deja Decl. ¶4).  Artisan has also failed to introduce any information regarding consumer studies, unsolicited media coverage, and a long, extensive use of the fleur-de-lis logo.  Thus, Artisan has failed to show adequate evidence that the fleur-de-lis logo has acquired secondary meaning.

In addition, this Circuit has made clear that extensive third-party use can dilute the strength of a mark.  *W.W.W. Pharma.*, 984 F.2d at 573; *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 581 (2d Cir. 1991).  This is because "[t]hird-party uses of a mark on similar goods are relevant for the purposes of showing a 'crowded field' and that the mark is therefore weak."  *Lexington Management Corp. v. Lexington Capital Partners*, 10 F.Supp.2d 271, 281 (S.D.N.Y. 1998).  As discussed, fleur-de-lis logos are common in the marketplace, including usage on sinks and fixtures.  (Chiodo Decl. ¶24).

Given the short period of use, the lack of distinctiveness of the fleur-de-lis mark in commerce, the vast number of similar designs in commerce, and the lack of any showing of

secondary meaning, it is clear that Artisan unregistered fleur-de-lis logo is not a valid mark entitled to protection under the Lanham Act.

### 2.    Usage of AGM's Crown Logo Is Not Likely To Cause Confusion

Even if somehow Artisan can establish that its fleur-de-lis logo is both valid and entitled to protection, Artisan will be unable to establish that its fleur-de-lis logo is infringed by AGM's crown logo.  In this regard, a showing of infringement of a trademark requires a showing that there is a likelihood of confusion between the marks.  *IMAF, S.P.A. v. J.C. Penney Co., Inc.*, 806 F.Supp. 449, 455 (S.D.N.Y. 1992).  Likelihood of confusion in this Circuit is established by a consideration of the *Polaroid* factors.  *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961).

The *Polaroid* Factors include the following eight non-exclusive factors: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the owner will bridge the gap; (5) evidence of actual confusion; (6) defendant's good faith in adopting the mark; (7) the quality of defendant's product; and (8) the sophistication of the consumers.  *See Brennan's Inc. v. Brennan's Rest.*, 360 F.3d 125, 130 (2d Cir. 2004).  In balancing these factors, a court should not treat any one factor as dispositive; neither should it apply the test in a rote fashion such that the party with the greatest number of factors wins.  *SLY Magazine, LLC v. Weider Publications L.L.C.*, No. 05-Civ-3940, 2007 WL 4577389, at * (S.D.N.Y. 2007).  "Instead, the court should focus on the ultimate question of whether consumers are likely to be confused."  *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 162 (2d Cir. 2004).

### a.    Artisan's Fleur-de-Lis Logo Is Weak

As discussed above, Artisan's fleur-de-lis logo is unregistered.  Determination of strength
is made "by its tendency to uniquely identify the source of the product."  *Star Indust.* 412 F.3d at
384.  This tendency "is strong to the extent that the mark is distinctive, either inherently or by
virtue of having acquired secondary meaning."  *Id*.  As explained above, commonplace designs
are not inherently distinctive.  Moreover, Artisan has failed to show any compelling evidence
that it has acquired secondary meaning in its unregistered logo, including its relatively short use,
minimal advertising expenditures, its lack of unsolicited media coverage, and the lack of
extensive and exclusive use.  As such, Artisan's fleur-de-lis logo must be considered weak.  This
factor weighs strongly in favor of AGM.

   b.  <u>The Marks in Dispute are Dissimilar</u>

  The Court must compare Artisan's fleur-de-lis logo and AGM's crown logo to determine
whether they are sufficiently similar.  In assessing similarity between the marks "courts look to
the overall impression created by the logos" and "consider the totality of factors that could cause
confusion among prospective purchasers."  *Id.* at 386.  Courts must analyze "the mark's overall
impression on a consumer, considering the context in which the marks are displayed."  *Malletier
v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005).  Courts must
evaluate the likely effect on consumers "with a focus on market conditions" and "in light of the
way in which the marks are actually displayed in their purchasing context."  *Id*. at 539.  The
Second Circuit has stated that even close similarity between the marks is not dispositive, the
"crux of the issue is whether the similarity is likely to cause confusion among numerous
customers who are ordinarily prudent."  *Savin Corp.*, 391 F.3d at 458.

  Here, it is clear from a quick glimpse at the two marks that they are wholly different.  A
side-by-side comparison is useful in seeing the glaring differences between the marks.  (Deja

Decl. ¶45). Clearly, there are substantial differences in the marks themselves. One would not be likely to confuse the two. In addition, a plurality of crown logos currently coexist in the marketplace in connection with sinks and related fixtures. (Chiodo Decl. ¶24). Thus, given the clear dissimilarities between the marks as a whole, and the existence of other crown logos in the marketplace, a consumer would not find such logos to be similar. This factor thus weighs strongly in favor of AGM.

### c.    The Products are not in Competitive Proximity

The next *Polaroid* factor considers the proximity of the products sold. As explained by the Second Circuit, "[t]his factor focuses on whether the two products compete with each other." *Savin Corp.*, 391 F.3d at 458-59. Although AGM acknowledges that the products in dispute are sinks, consideration of this factor does not end there. Rather, this factor focuses on whether the two products compete with each other, taking into account their market position and audience appeal, among other considerations.

There can be no real assertion that Artisan's sinks and AGM's sinks compete with each other. Artisan is a company that sells sinks and sink accessories to consumers. In contrast, AGM is in the business of selling and installing granite and marble countertops. (Deja Decl. ¶2). AGM does not sell sinks. (Deja Decl. ¶9) Customers do not come to AGM for sinks or sink accessories – they come to buy a countertop. Clearly, the products sold by Artisan and AGM do not compete in the market, and do not have the same audience appeal. As such, this factor weighs strongly in favor of AGM.

### d.    There Is No Actual Confusion Between the Marks

Although Artisan need not show actual confusion between the marks, the existence of actual confusion is probative of likelihood of confusion. The Second Circuit has stated that "the

absence of proof of actual confusion, although not dispositive of the question of likelihood of confusion, is a factor favoring defendants." *Streetwise Maps, Inc. v. Vandam Inc.*, 159 F.3d 739, 745 (2d Cir. 1998).

Here, Artisan would have this Court believe that it has shown actual confusion, when in fact, it has not. The allegations of customer confusion by Artisan are nothing more than unsupported hearsay, and should not be considered by this Court. F.R.E. 801, 802. According to the Declaration of Alex Han, "customers of All Granite began contacting Artisan to purchase accessories for the sinks being installed by All Granite, and to report problems with the sinks." However, Mr. Han's subsequent testimony revealed that he had never spoken to any of these allegedly confused customers. (Chiodo Decl. ¶23). It should also be noted that none of these allegedly confused customers has ever contacted AGM with a complaint. (Deja Decl. ¶6). Moreover, to date Artisan has not produced any evidence relating to "problems with the sinks."

Having had a past relationship with Artisan, AGM may have referred customers to Artisan for accessories. There is no confusion in telling a customer that Artisan, like many other sources, provides sink accessories. More importantly, there is simply no benefit to AGM in making such a referral, other than to satisfy its customer. Artisan's attempt to twist such a referral, if it occurred, into actual confusion must be rejected.

Of the thousands of customers receiving a promotional sink from AGM, Artisan has identified only seven "complaining customers". Of these seven customers, only one has offered a declaration. This Declaration confirms that the Declarant was not confused at the time of purchase, but was merely seeking a sink accessory from Artisan.

In particular, the Declarant, Alice Anderson, obtained a countertop and sink from AGM. Since stainless steel sinks scratch (including Artisan's sinks), Ms. Anderson contacted AGM for a bottom

18

grid for the sink. It is unclear if AGM indicated that sink accessories may be obtained from Artisan or if someone at AGM in fact indicated that her sink may have been manufactured by Artisan. In any regard, Ms. Anderson contacted Artisan regarding a sink accessory and was informed that none was available. After her inquiry, Ms. Anderson was contacted by an Artisan representative who "informed her that her sink may not be an Artisan sink." Although this follow-up by Artisan was clearly an attempt to "convince" Ms. Anderson that she had been confused, and although the declaration was clearly drafted by Artisan's attorney, Ms. Anderson was apparently unwilling to state that she had been confused at the time of purchase, or that she even cared about the brand of sink she was receiving. It is important to note that Ms. Anderson's installation cost approximately $5,000, but to date she has never complained to AGM about her installation or the sink she received.

The evidence with respect to the remaining six customers is even less relevant/credible. This "evidence" amounts to no more than Mr. Amabile's testimony as to the substance of his conversations (or of another Artisan representative) with such customers. However, these conversations were not documented in writing (with the exception of one inadmissible email string) despite the apparent importance of such conversations. (Chiodo Decl. ¶20). Moreover, one of the seven named customers merely left a message with Artisan about obtaining a sink grid, and has not spoken to any Artisan representative about the purchase of his countertop. (Chiodo Decl. ¶20). Finally, Mr. Amabile acknowledged during his deposition that at least four of the seven customers did not indicate that they were confused at the time of purchase. (Chiodo Decl. ¶20). Mr. Amabile's testimony with respect to the remaining three is simply inadmissible hearsay.

Even if this Court considers the naked allegations of confusion, Artisan has failed to introduce any evidence (whether admissible or otherwise) that the particular consumers were

19

confused by the AGM crown logo.  In this regard, the "evidence" being offered by Artisan is directed to word ARTISAN, not to the fleur-de-lis.  Even the sole declaration of Ms. Anderson does not support Artisan's allegations of confusion between the fleur-de-lis logo and the crown logo.  Thus, Artisan has failed to show any evidence whatsoever of actual confusion between the fleur-de-lis logo and the crown logo.  This factor weighs strongly in favor of AGM.

      e.      <u>There Is No Likelihood That Plaintiff Will Bridge The Gap</u>

The next factor considers whether Plaintiff is likely to enter a market that competes with AGM.  *See Savin Corp.*, 391 F.3d at 459-60.  As explained above, the services and products sold by AGM and Artisan are vastly different, and the parties are not in direct competition with each other.  AGM is a seller and installer of granite countertops and accessories, while Artisan is a seller of sinks and sink accessories.  There is no assertion or indication that Artisan will enter a field that competes with AGM, such as countertop installations.  The fact that Artisan sells sinks and AGM provides free sinks with countertop installations cannot, by itself, establish that the parties are competitive in the same markets.  This factor weighs in favor of AGM.

      f.      <u>AGM Adopted Its Mark In Good Faith</u>

The next factor considers whether the defendant adopted its mark in good faith.  Bad faith generally refers to "exploit[ing] the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."  *Star Indus.*, 412 F.3d at 388.  Clear differences between the marks themselves can be probative of the defendant's intent.  *See Streetwise Maps*, 159 F.3d at 746 ("[Defendants] did not believe this mark infringed on plaintiff's because of differences between the two marks.").

Here, AGM considers that the two marks, its crown logo and Artisan's common fleur-de-lis logo are vastly different.  (Deja Decl. ¶45).  Merely because AGM may have been aware of

Artisan's mark does not, by itself, show any intent of AGM to copy Artisan's good will.  In fact, AGM made a conscious effort to avoid being associated with Artisan.  (Deja Decl. ¶31).  AGM determined that association with Artisan would be of no benefit, since the Artisan brand was not well-known or eye-catching, and thus it developed its own independent logo.  (Deja Decl. ¶¶31-32).

The AGM crown logo was created with an eye toward developing a logo that shows AGM's strong stature, and would be geared toward its prospective customers.  (Sroka Decl. ¶5).  AGM is a Polish-based business, which takes great pride in its Polish heritage and tradition.  (Sroka Decl. ¶5).  Thus, it sought to create a logo that would embody the strong, regal nature of the Polish tradition.  (Sroka Decl. ¶6).

After researching various sources regarding Polish history, AGM decided that a crown logo would fit this need, and looked to the past Kings of Poland for inspiration.  (Sroka Decl. ¶6).  Looking at King Boleslaw I of Poland (The Brave), AGM found the crown that it sought.  (Sroka Decl. ¶7).  AGM's designer essentially copied King Boleslaw I's crown for its logo.  (Sroka Decl. ¶8).  The AGM crown logo is a three-pronged crown having jewel-shaped portions, and further incorporating fancy swirled designs emanating from the base of the crown.  (Deja Decl. ¶37).  Since AGM wished to use the logo at the top of a website, it asked the designer to give it a more horizontal aspect, and thus the designer stretched out the fancy swirled design to the left and right.  (Deja Decl. ¶37).  In addition, contemporaneously, AGM developed a second sink logo which is not at issue in this case.  (Sroka Decl. ¶4).  However, the second logo is further proof that AGM's designer did not look to Artisan's logo in creating the AGM designs.

Given that the two marks are completely different, and understanding AGM's purpose behind developing its own logo, it is clear that AGM acted in good faith. AGM's crown logo shows its strong and proud Polish heritage. This factor weighs heavily in favor of AGM.

g.    Defendant's Products Are Of Sufficient Quality

The next factor considers the quality of the defendant's goods, and particularly whether the plaintiff's reputation would be jeopardized by defendant's goods. *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995). Courts generally look to whether one product is "markedly superior in quality to the other." *Star Indus.*, 412 F.3d at 389.

AGM's products are of sufficient quality, as evidenced by the fact that it has never received a single complaint about the quality of its sinks themselves. (Deja Decl. ¶6). Artisan has never inspected or tested an AGM sink. (Chiodo Decl. ¶23) Again, Artisan relies upon the unsupported hearsay of "complaints received by All Granite's customers" without providing proof of these complaints. The only assertion of inferiority quality is AGM's use of 18-gauge steel in its sinks. AGM's sinks are 18-gauge sinks, have a fine finish and are sufficiently sturdy. (Deja Decl. ¶27).

A quick review of the sink market shows that there are many sinks having varying degrees of gauges. The "market standard" for sinks is 18-gauge, but any range from 16-20 gauges is generally regarded as acceptable. (Deja Decl. ¶26). Artisan itself manufactures 18-gauge sinks, as evidenced by a current IAPMO Certification for Artisan products; Artisan manufactures both 16 and 18 gauge sinks. (Chiodo Decl. ¶19). Further, an Artisan advertisement for sinks refers to Artisan 18-gauge sinks as "premium" and "high quality". (Chiodo Decl. ¶16). Although a 16-gauge sink may provide some additional benefits as compared to an 18-gauge sink, this does not mean that a 16 gauge sink is "markedly superior" to

an 18-gauge sink.  AGM's 18-gauge sink is not a low quality product that would jeopardize

Artisan's reputation.  Such assertions are especially weakened by Artisan's own sale and

manufacture of 18-gauge sinks.  Moreover, Artisan could have, but did not, submit AGM's sinks

to an independent laboratory for testing.  (Chiodo Decl. ¶23).  Artisan has failed to prove that

AGM's sinks are of such poor quality that Artisan's questionable reputation would be harmed.

As such, this factor weighs in favor of AGM.

h.      Consumers Who Purchase AGM's Goods Are Sophisticated

The final *Polaroid* factor considers the sophistication of the customers who would

purchase AGM's goods.  As the Second Circuit has stated, "the more sophisticated the

purchaser, the less likely he or she will be confused by the presence of similar marks in the

marketplace."  *Savin Corp*. at 461.  In general, "where the cost of the defendant's trademarked

product is high, the courts assume that purchasers are likely to be more discriminating than they

might otherwise be."  Id.  A court must consider "the general impression of the ordinary

consumer, buying under normal market conditions and giving the attention such purchasers

usually give in purchasing the product at issue."  *Streetwise Maps*, 159 F.3d at 746.

Even Artisan acknowledges that the purchasers of AGM's products (granite countertops)

may be considered sophisticated.  Artisan fails to establish that a sophisticated consumer would

be misled by a comparison of the fleur-de-lis logo and the crown logo.  A purchaser of granite

countertops can be expected to spend at least $2,000, and up to more than $5,000 for such

purchase and installation.  (Deja Decl. ¶8).  Clearly, such a high expenditure is not an impulse

purchase, and instead would be made only after careful consideration of the products.  Given the

extremely high level of sophistication of AGM's purchasers, this factor weighs strongly in favor

of AGM.

i.    Artisan Has Failed To Satisfy Any of the Polaroid Factors

A review of the 8 *Polaroid* factors shows that each and every factor weighs in favor of AGM.  Artisan has failed to satisfy any of the relevant factors, let alone satisfy a sufficient number of factors to show likelihood of confusion between Artisan's fleur-de-lis mark and AGM's crown logo.  The two marks and the markets in which the products are distributed are squarely different.  The likelihood that a customer would be confused between the two is extremely low.  As such, Artisan is not likely to succeed on the merits of its trademark infringement claim.

III.    Artisan has Failed to Demonstrate Irreparable Harm

In addition to showing success on the merits, Artisan must demonstrate that it will be subject to irreparable harm should the preliminary injunction not issue.  *D.D.*, 465 F.3d at 510. Here, Artisan's delay in seeking a preliminary injunction negates any presumption which might otherwise arise during a likelihood of confusion analysis.  In *Tough Traveler Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2nd Cir. 1995), the Second Circuit held that "any such presumption of irreparable harm is inoperative if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief".

Although Artisan's moving papers indicate it learned of AGM's allegedly infringing activities in late October (Han Decl. ¶14), Mr. Amabile's testified that he first visited AGM's showroom prior to June 26, 2007, and allegedly observed infringing specification sheets, as well as a poster.  (Chiodo Decl. ¶20).  As discussed above, this testimony is less than credible in view of Mr. Amabile's last minute recollection of such important information.  Nonetheless, the regional sales manager for Artisan has testified under oath that he was aware of certain activity within AGM's showrooms more than six months prior to Artisan's request for a preliminary

injunction, and more than four months prior to the initiation of its investigation. This fact alone should negate any presumption of irreparable harm. Finally, Artisan has not shown that, if it is successful in on the merits, that it cannot be adequately compensated by a monetary judgment. Accordingly, Artisan's request for a preliminary injunction should be denied.

IV.    The Balance of Hardships Favors AGM

In addition to failing to show likelihood of success on the merits, Artisan has failed to show serious questions on the merits coupled with the balance of hardships in its favor. In fact, if the requested injunction is granted, the balance of hardships lies strongly against AGM. The balance of hardships, should the injunction be granted, lays strongly against AGM in this case. The Second Circuit has found that potential harms to defendants' business practices may "outweigh any potential hardships to [plaintiff], which, if it ultimately prevails on the merits, can recover money damages." *Random House Inc. v. Rosetta Books LLC*, 283 F.3d 490, 492 (2d Cir. 2002).

Here, AGM not only has already purchased hundreds of thousands of dollars worth of sinks bearing its crown logo, but AGM has also distributed millions of its "FREE SINK" coupons to potential customers. (Deja Decl. ¶13). If AGM is enjoined from continuing to distribute its sinks, it will be unable to honor its "free sink" coupons. This hardship clearly outweighs any potential harm to Artisan.

## CONCLUSION

For the foregoing reasons, including (1) the fact that the Artisan sink has already been removed from AGM's showroom and (2) the fact that Artisan is unlikely to succeed on the merits of its claims, AGM requests that this Court deny Artisan's Motion for a Preliminary

Injunction.  Further, AGM requests that this Court remove the Temporary Restraints that have been ordered in this Action.


Dated:  __2/20/08_____                    Respectfully submitted,


                              By:      _____s/ Jon A. Chiodo_____
                                       **Jon A. Chiodo (JC 1215)**
                                       **HOFFMANN & BARON, LLP**
                                       6 Campus Drive
                                       Parsippany, NJ 07054
                                       973-331-1700
                                       Email: JACDocket@hoffmannbaron.com

                                       **ATTORNEYS FOR DEFENDANT**
                                       **All Granite & Marble Corporation**

289459_1.DOC