Louis S. Ederer
John Maltbie
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022
(212) 715-1000

*Attorneys for Plaintiffs Artisan Manufacturing Corporation*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

ARTISAN MANUFACTURING CORPORATION,

        Plaintiff,

- against -

ALL GRANITE & MARBLE CORPORATION.,

        Defendant.

---------------------------------------------------------------- x

Civil Action No.: 07 CV 11278

**DECLARATION OF JOHN MALTBIE IN FURTHER SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

# EXHIBIT D

Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARTISAN MANUFACTURING            )
CORPORATION,                     )
                                 )
                Plaintiff,       )  No. 07-CV-11278
                                 )       (WHP)
        -against-                )
                                 )
ALL GRANITE & MARBLE             )
CORPORATION,                     )
                                 )
                Defendant.       )
- - - - - - - - - - - - - - - - -x
```

DEPOSITION OF JIAN XIONG HAN

New York, New York
Tuesday, February 5, 2008

CONTAINS CONFIDENTIAL PORTIONS

Reported by:
JEFFREY BENZ, CRR, RMR
JOB NO. 15218

Page 2

```
 1
 2
 3
 4
 5           February 5, 2008
 6             12:17 p.m.
 7
 8
 9      Deposition of JIAN XIONG HAN, held at the
10  offices of Arnold & Porter, 399 Park Avenue, New
11  York, New York, pursuant to Notice, before Jeffrey
12  Benz, a Certified Realtime Reporter, Registered
13  Merit Reporter and Notary Public of the State of
14  New York --
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide   877-702-9580

Page 3

```
 1
 2  APPEARANCES:
 3
 4    HOFFMANN BARON, LLP
      Attorneys for Plaintiff
 5
        6900 Jericho Turnpike
 6
        Syosset, New York  11791-4407
 7
      BY: R. GLENN SCHROEDER, ESQ.
 8
 9
10    ARNOLD & PORTER LLP
11    Attorneys for Defendant
12      399 Park Avenue
13      New York, New York  10022-4690
14    BY: JOHN MALTBIE, ESQ.
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide   877-702-9580

Page 4

```
 1
 2      IT IS HEREBY STIPULATED AND AGREED by
 3  and between the attorneys for the
 4  respective parties herein that filing and
 5  sealing be and the same are hereby waived.
 6      IT IS FURTHER STIPULATED AND AGREED
 7  that all objections, except as to the form
 8  of the question, shall be reserved to the
 9  time of the trial.
10      IT IS FURTHER STIPULATED AND AGREED
11  that the within deposition may be signed
12  and sworn to before any officer authorized
13  to administer an oath with the same force
14  and effect as if signed and sworn to before
15  the Court.
16
17          -oOo-
18
```

TSG Reporting - Worldwide   877-702-9580

Page 5

```
 1              Han
 2  JIAN XIONG HAN,
 3      called as a witness, having been duly sworn
 4      by a Notary Public, was examined and
 5      testified as follows:
 6  EXAMINATION BY
 7  MR. SCHROEDER:
 8      Q.  Good afternoon.  Please state your
 9  full name and residence for the record.
10      A.  Full name, Jian Xiong Han, and you can
11  call me Alex.  I go by Alex also.  And
12  residence, 45 River Drive South, Apartment 3102,
13  Jersey City, New Jersey 07310.
14      MR. SCHROEDER:  Let me go ahead and
15  mark the following two documents as
16  Defendant's Exhibit 1 and Defendant's
17  Exhibit 2.
18      (Notice of deposition was marked
19  Defendant's 1 for identification, as of
20  this date.)
21      (Notice of deposition was marked
22  Defendant's 2 for identification, as of
23  this date.)
24      Q.  Mr. Han, I'm showing you what's been
25  marked as Defendant's Exhibit 1, and 2, and I
```

TSG Reporting - Worldwide   877-702-9580

Page 6

```
                    Han
 1   ask, have you seen these documents before, and
 2   do you understand what they are?
 3       A.  I have not seen this one, but this
 4   one, I think, you go -- John has go over it with
 5   me on --
 6       Q.  Okay, that's fine.  You can stop
 7   there.  That's fine.
 8           Do you understand that you're here
 9   both in your individual capacity as a witness,
10   but also on behalf of the company as a witness?
11       A.  Yes.
12       Q.  Okay.  So looking back at Defendant's
13   Exhibit 2, the schedule of topics that's set
14   forth on page 4, have you seen that schedule
15   before?
16       A.  Yes.
17       Q.  Okay.  And can you tell me which
18   topics you are here to testify to today?
19       A.  Which topic?
20       Q.  Let me make it a little bit easier.
21   Are there any topics which you are not qualified
22   to testify to today, listed on that sheet?
23       A.  Number 6.
24       Q.  Okay.
```
TSG Reporting - Worldwide    877-702-9580

Page 7

```
                    Han
 1       A.  Number 7.
 2       Q.  Is that it?
 3       A.  I know only parts of it, so....
 4       Q.  Okay.
 5           Have you ever been deposed before?
 6       A.  No.
 7       Q.  Do you understand what's expected of
 8   you today?
 9       A.  Just tell whatever I know.
10       Q.  Good.  What will happen today is I'll
11   ask you a series of questions.  I'll ask you to
12   answer them truthfully, to the best of your
13   knowledge.  If you don't understand the
14   question, please tell me and I'll try to
15   rephrase it or restate the question.
16           If you don't know an answer, simply
17   say, I don't know.  We don't want you to guess.
18           If you need a break --
19       A.  Sure.
20       Q.  -- take breaks.
21           Is there any reason why you can't
22   testify truthfully today?  Are you taking any
23   medications or drugs which would impact your
24   ability to tell the truth?
```
TSG Reporting - Worldwide    877-702-9580

Page 8

```
                    Han
 1       A.  No.
 2       Q.  Just please wait till I finish the
 3   question before you answer.
 4       A.  Okay.
 5       Q.  Otherwise the court reporter has
 6   trouble taking down everything that's said.
 7           Starting with college, can you give me
 8   a brief overview of your educational background.
 9       A.  University of Montana, graduated from
10   there in -- business major and --
11       Q.  What year was that?
12       A.  What year is that.  1994 through 1997.
13       Q.  So you graduated in '97 or '98.
14       A.  Yeah.
15       Q.  Following graduation from the
16   University of Montana, did you attend any
17   additional schools?
18       A.  Yes.  Actually I was here to take a --
19   I think it's a Kaplan, to take a GMAT test,
20   training course, and that's it.
21           That's the only school I attended.
22       Q.  Since college, what has been your work
23   experience?
24       A.  I worked for MetLife.
```
TSG Reporting - Worldwide    877-702-9580

Page 9

```
                    Han
 1       Q.  In what capacity?
 2       A.  As a financial analyst.  Agent.  And
 3   selling life insurance as of -- family
 4   consumers, financial, health, and -- and provide
 5   applicable products to them.
 6       Q.  Okay.  Following your stay at MetLife,
 7   were you employed at another company --
 8       A.  Yeah.
 9       Q.  When did you first start Artisan
10   Manufacturing?
11       A.  2003.
12       Q.  Was that following your employment at
13   MetLife?
14       A.  Yes.
15       Q.  Was there any employment in between
16   MetLife and the starting of Artisan
17   Manufacturing?
18       A.  Wellcare of -- Wellcare -- it's a --
19   it's a -- it's a -- it's a clinic.  They have
20   like two, three branches, and worked there
21   briefly on the accountant, as an accountant,
22   bookkeeping, that kind of thing.
23       Q.  Do you have any technical training?
24       A.  Technical training on what?
```
TSG Reporting - Worldwide    877-702-9580

### Page 10

```
1                    Han
2       Q. In any areas. Any sort of engineering
3   classes, materials classes.
4       A. No.
5       Q. Any sort of science classes?
6       A. No.
7          MR. SCHROEDER: I would like to at
8   this point just go over a little bit of
9   background of this case, just to get us all
10  on the same page.
11         So let me go ahead and mark the
12  following two documents as Defendant's
13  Exhibit 3 and 4.
14         (Document dated December 14, 2007, was
15  marked Defendant's 3 for identification, as
16  of this date.)
17         (Document dated December 20, 2007, was
18  marked Defendant's 4 for identification, as
19  of this date.)
20      Q. Mr. Han, you've been handed what's
21  been marked as Defendant's Exhibit 3 and 4. Let
22  me just direct your attention to Defendant's
23  Exhibit 3.
24         Do you recognize that document?
25      A. Yes.
```
TSG Reporting - Worldwide    877-702-9580

### Page 11

```
1                    Han
2       Q. You understand the purpose behind that
3   document?
4       A. Yes.
5       Q. And what was that purpose?
6       A. Stop All Granite from selling their
7   sinks bearing the infringing mark with Artisan.
8       Q. And you know the date on the document
9   is December 14, 2007?
10      A. Yes.
11      Q. Who was that document sent to?
12      A. Sent to the owner of All Granite.
13      Q. Let me now direct your attention to
14  Defendant's Exhibit 4.
15         Have you ever seen that document
16  before?
17      A. Yes.
18      Q. And do you understand the substance of
19  that document?
20      A. Yes.
21      Q. And what is the substance of that
22  document?
23      A. Basically it's the response from
24  attorney representing All Granite, regarding the
25  cease and desist letter.
```
TSG Reporting - Worldwide    877-702-9580

### Page 12

```
1                    Han
2       Q. Upon receipt of -- let me rephrase
3   that.
4          When you were advised that your
5   counsel had received this letter, did you
6   attempt to contact All Granite in any way?
7       A. No.
8          MR. MALTBIE: Objection to form.
9          You can answer.
10      Q. Did you instruct your counsel to
11  contact All Granite to further discuss this
12  matter?
13         MR. MALTBIE: Objection.
14      Q. You can answer the question.
15         THE WITNESS: You object, so I don't
16  have to answer, right?
17      Q. No. You still have to answer the
18  question.
19         MR. MALTBIE: You can answer this
20  question.
21      A. I remember having a conversation with
22  my attorney, and --
23      Q. Don't discuss anything privileged. I
24  don't want to know the substance of the
25  conversation, just did you direct your attorney
```
TSG Reporting - Worldwide    877-702-9580

### Page 13

```
1                    Han
2   to contact either -- or in this case, would it
3   be All Granite attorneys?
4       A. Yes.
5       Q. Please note that Defendant's Exhibit 4
6   is marked -- sorry, dated December 20, 2007.
7   You see that at the top of the page?
8       A. Yes.
9          MR. SCHROEDER: Okay. Now,
10  procedurally, following the receipt of
11  Hoffmann & Baron's letter dated December
12  20, which is Defendant's Exhibit 4, a
13  complaint was filed. And let me mark this
14  next document as Defendant's Exhibit 5.
15         (Complaint was marked Defendant's 5
16  for identification, as of this date.)
17         MR. MALTBIE: For the record, the
18  complaint was actually filed at the same
19  time that the initial cease and desist
20  letter was sent out.
21         It states that, December 14, on the
22  front.
23         MR. SCHROEDER: So noted.
24      Q. Who authorized the filing of the
25  complaint at Artisan Manufacturing?
```
TSG Reporting - Worldwide    877-702-9580

Page 14

```
               Han
 1   A.  Could you say it again?
 2   Q.  Who authorized the filing of this
 3   complaint?
 4   A.  Me.
 5   Q.  Did you review this complaint prior to
 6   it being filed?
 7   A.  Did I what?
 8   Q.  Review the complaint prior to it being
 9   filed.
10   A.  I have discussed with my regional
11   sales manager, Joe, and discussed with my
12   counsel, on that.
13   Q.  Do you understand the substance of the
14   claims asserted in this complaint?
15   A.  Yes.
16   Q.  I understand you're not a lawyer, but
17   let me just refer your attention to the first
18   claim in this complaint, which is set forth on
19   page 5.
20       The claim is for trademark
21   counterfeiting and violation of Section 32 of
22   the Lanham Act.
23   A.  Okay.
24   Q.  You understand what counterfeiting is?
```

TSG Reporting - Worldwide   877-702-9580

Page 15

```
               Han
 1       MR. MALTBIE:  Objection to form.
 2   Q.  You can answer the question.
 3       MR. MALTBIE:  If you know.  You don't
 4   have to know.
 5   A.  I don't know the answer, no.
 6   Q.  Let me refer your attention to
 7   paragraph 18 of this complaint.  Can you please
 8   read that paragraph 18.
 9   A.  "All Granite, without authorization,
10   has used the" --
11   Q.  Designation.
12   A.  -- "designation that is identical
13   with, or substantially indistinguishable from,
14   the registered Artisan trademark in connection
15   with this distribution advertising promotion,
16   marketing, sale, and/or offering for sale of
17   counterfeit Artisan sinks."
18   Q.  Thank you.  Is it your position that
19   the crown logo used by All Granite is identical
20   to or substantially indistinguishable from the
21   registered Artisan trademark?
22   A.  Yes.
23       MR. MALTBIE:  Objection to form.
24   Q.  Let me refer your attention now to the
```

TSG Reporting - Worldwide   877-702-9580

Page 16

```
               Han
 1   fourth claim set forth in the complaint, which
 2   appears on page 8.  Again, I understand you're
 3   not an attorney, but do you know what false
 4   advertising is?
 5   A.  Not in legal term, I don't understand.
 6   Q.  Can you refer your attention to
 7   paragraph 39.  Can I ask you to read paragraph
 8   39.
 9   A.  "Upon information and belief, the
10   aforesaid acts of All Granite constitute false
11   advertising, in that All Granite informs
12   customers that they will be receiving an
13   authentic Artisan brand sink when purchasing All
14   Granite's kitchen installation services, but
15   then installed a sink that is not manufactured,
16   sold, priced, or authorized by Artisan."
17   Q.  Are those allegations the basis for
18   the false advertising claim?
19       MR. MALTBIE:  Objection to form.
20   Q.  You can answer the question.
21   A.  I don't understand what is false
22   advertising.  So I can't answer this question,
23   no.
24   Q.  Did Artisan ever conduct any tests on
```

TSG Reporting - Worldwide   877-702-9580

Page 17

```
               Han
 1   an All Granite sink?
 2   A.  No.
 3   Q.  And when I say tests, I mean
 4   engineering tests, having an outside consultant
 5   or engineering firm look at an Artisan sink.
 6   I -- correct that.  Look at an All Granite sink.
 7   A.  No.
 8   Q.  And finally, let me just refer your
 9   attention to the eighth claim for relief that's
10   set forth on page 10 of the complaint.
11       And in particular, I'd like you to
12   look at paragraph 61.
13       Do you understand what a bait and
14   switch is?
15   A.  Yes.
16   Q.  Can you explain that to me.
17   A.  Basically, if you promise me to
18   something, and then tell me you're going to get
19   this, but you change to something else that is
20   not meeting my expectation, that is a bait and
21   switch.
22   Q.  Thank you.
23       With respect to the alleged bait and
24   switch, how does All Granite lure its customers
```

TSG Reporting - Worldwide   877-702-9580

Page 18

```
                    Han
 1
 2   into its showrooms?
 3         MR. MALTBIE: Objection to form.
 4      Q. You can answer the question. If you
 5   understand.
 6      A. I don't understand, no.
 7      Q. Does All Granite use any sort of
 8   deceptive advertising to entice consumers to
 9   come into its showrooms?
10         MR. MALTBIE: Objection to form.
11      A. I don't know the answer.
12      Q. Have you ever seen any advertisements
13   which would — or which do contain an Artisan
14   trademark that are put out by All Granite?
15      A. No.
16      Q. Thank you.
17         Who authorized the preparation of the
18   preliminary injunction motion papers?
19      A. I authorized them.
20      Q. Now, as Mr. Maltbie noted, the
21   complaint was filed on December 14, and the
22   motion papers were served on defendant's counsel
23   at 8:40 p.m. on January 10.
24         Let me just go ahead and mark this
25   document as Defendant's Exhibit 6.
```
TSG Reporting - Worldwide   877-702-9580

Page 19

```
                    Han
 1
 2         (E-mail string showing receipt of
 3   Artisan's injunction papers was marked
 4   Defendant's 6 for identification, as of
 5   this date.)
 6      Q. Mr. Han, this is just an e-mail string
 7   showing the receipt of Artisan's injunction
 8   papers by our law firm on Wednesday, January 9,
 9   at 8:40 p.m.
10      A. Okay.
11      Q. Now, between the filing of the
12   complaint and the service of these papers, did
13   something change that required this expedited
14   process to be started?
15         MR. MALTBIE: Objection, form.
16      A. I don't understand your....
17      Q. We noted the complaint was filed
18   December 14, and on January 9, motion papers
19   were filed requesting a preliminary injunction.
20         My question is, did anything change in
21   that period of time between December 14 and
22   January 9, which would require an expedited
23   process to take place?
24         MR. MALTBIE: Objection to form.
25      Q. For example, did you receive any
```
TSG Reporting - Worldwide   877-702-9580

Page 20

```
                    Han
 1
 2   additional complaints during that period?
 3         MR. MALTBIE: Objection to form.
 4      Q. Were you made aware of additional
 5   information during that period of time?
 6      A. I don't remember, no.
 7      Q. Okay. Thank you.
 8         MR. SCHROEDER: I would like to mark
 9   the following two documents as Defendant's
10   Exhibit 7 and 8.
11         (E-mail was marked Defendant's 7 for
12   identification, as of this date.)
13         (E-mail cover page and letter dated
14   January 10, addressed to Mr. Ederer from
15   Mr. Lou Budzyn, were marked Defendant's 8
16   for identification, as of this date.)
17      Q. Can I direct your attention, Mr. Han,
18   to Defendant's Exhibit 7, and in particular to
19   the e-mail sent to Mr. Ederer by Jon Chiodo on
20   January 9.
21         Have you seen this before?
22      A. No.
23      Q. Could I ask you to read that. You can
24   read it to yourself. You don't need to read it
25   out loud.
```
TSG Reporting - Worldwide   877-702-9580

Page 21

```
                    Han
 1
 2         (The witness read.)
 3      A. Okay.
 4      Q. You understand the substance of that
 5   e-mail?
 6      A. Yeah. Basically you're saying you are
 7   not going to display Artisan sinks anymore,
 8   remove whatever is currently on display.
 9      Q. Okay. And that was on January 9,
10   correct?
11      A. Yeah.
12      Q. Okay. Great. Could I refer your
13   attention to Defendant's Exhibit 8. The first
14   page is an e-mail cover page, and the second two
15   pages are a letter dated January 10, addressed
16   to Mr. Ederer from Mr. Lou Budzyn of our law
17   firm.
18         Have you seen this letter before?
19      A. No.
20      Q. No?
21      A. No.
22      Q. Could I ask you to read this letter,
23   again, to yourself.
24         (The witness read.)
25      A. All right.
```
TSG Reporting - Worldwide   877-702-9580

Page 22

```
 1                    Han
 2    Q. Did you understand the substance of
 3 this letter?
 4    A. Right.
 5    Q. Can you tell me what the letter
 6 states.
 7    A. Basically, you say you've already
 8 removed, then there's no further reasons to
 9 escalate the issue.
10    Q. Do you have any reason to doubt that
11 the sink wasn't removed on January 10?
12    A. Any reason. Other than I can't trust
13 them.
14    Q. Okay, but you have no -- no firsthand
15 knowledge that the sink remains in the showroom,
16 correct?
17    A. I have not checked. And that neither
18 can I confirm as being removed or not being
19 removed, so -- that's from your telling me.
20    Q. Okay, but you haven't independently
21 confirmed that it has or hasn't been removed.
22    A. Have not.
23    Q. You have no reason to believe that it
24 still exists in the showroom, correct? Have you
25 received any --
```
TSG Reporting - Worldwide   877-702-9580

Page 23

```
 1                    Han
 2    A. That's correct.
 3    Q. Thank you.
 4       And again, this letter was dated
 5 January 10, 2008.
 6       MR. SCHROEDER: I would like to mark
 7    the following document as Defendant's
 8    Exhibit 9.
 9       John, if I could ask you to look over
10    his shoulder.
11       MR. MALTBIE: Is this the brief?
12       (Document seeking a preliminary
13    injunction against All Granite was marked
14    Defendant's 9 for identification, as of
15    this date.)
16    Q. Mr. Han, I've shown you what's been
17 marked as Defendant's Exhibit 9. Do you
18 recognize that document?
19    A. I don't read all the documents.
20    Q. Have you ever seen that document
21 before?
22    A. Have not.
23    Q. Do you understand what it is?
24    A. Yes.
25    Q. You understand that it was a document
```
TSG Reporting - Worldwide   877-702-9580

Page 24

```
 1                    Han
 2 filed by your lawyers seeking a preliminary
 3 injunction against All Granite?
 4    A. Yes.
 5    Q. Okay. Thank you.
 6       MR. SCHROEDER: And for the record,
 7    let me state that the hearing before
 8    Judge Pauley took place on January 11.
 9    Q. Could I refer your attention to page 2
10 of this document, the first full paragraph, and
11 in particular the last sentence -- actually, the
12 last sentence appearing on this page.
13       Could I ask you to read that sentence
14 to yourself, and feel free to read more --
15    A. Which sentence?
16    Q. The last sentence appearing on page 2.
17    A. This? This one?
18    Q. It starts, "as Artisan has no idea."
19    A. Right. It's right here.
20       (The witness read.)
21    A. That's correct.
22    Q. You understand what that sentence
23 says?
24    A. Right.
25    Q. On January 11, when this paper was
```
TSG Reporting - Worldwide   877-702-9580

Page 25

```
 1                    Han
 2 filed with the court, was that an accurate
 3 statement?
 4       MR. MALTBIE: Objection to form.
 5    Q. And let me be a little more
 6 particular. The second clause of that sentence,
 7 that reads, "All Granite has given no indication
 8 that it intends to cease such conduct."
 9       Is that an accurate statement in view
10 of Mr. Budzyn's letter from the prior day?
11       MR. MALTBIE: Objection to form.
12    A. I don't understand.
13    Q. On January 10, and I'll refer you back
14 to Exhibit 8, Mr. Budzyn advised Mr. Ederer that
15 the sink had been removed. On January 11, the
16 motion paper identified as Defendant's Exhibit 9
17 is filed, stating that All Granite has given no
18 indication that it intends to cease such
19 conduct.
20       MR. MALTBIE: Objection. The brief is
21    dated January 9 and was circuited on
22    January 9 to opposing counsel, so it's --
23    let's make sure we get the dates straight.
24    It's not the filing date, but the date it
25    was signed.
```
TSG Reporting - Worldwide   877-702-9580

Page 26

```
1                  Han
2      Q. Mr. Maltbie's comment was correct, the
3  brief was filed on --
4          MR. MALTBIE: Served.
5      Q. Correct myself -- was served on
6  January 9, but we appeared in court on
7  January 11 before Judge Pauley.
8          So on January 11 before Judge Pauley,
9  was it accurate to say All Granite has given no
10 indication that it intends to cease such
11 conduct?
12         MR. MALTBIE: Objection to form.
13     A. I don't know.
14     Q. Fair enough. And let me refer your
15 attention to one more sentence in this brief, if
16 I could.
17         On page 25, page 25 of the motion
18 paper, the first full paragraph, the third
19 sentence beginning with, "As All Granite
20 continues." I ask you to read that sentence,
21 and please feel free to read the whole
22 paragraph.
23     A. Say it again?
24     Q. The third sentence of the first full
25 paragraph. "As All Granite continues."
```
TSG Reporting - Worldwide   877-702-9580

Page 27

```
1                  Han
2          (The witness read.)
3      A. Okay.
4      Q. Again, my question to you is, on
5  January 11, when we appeared before Judge
6  Pauley, was that an accurate statement?
7          MR. MALTBIE: Objection to form.
8      A. I don't know.
9      Q. Fair enough.
10         MR. SCHROEDER: I would like to mark
11 the following document as Defendant's
12 Exhibit 10.
13         (Document pertaining to request for
14 document production was marked Defendant's
15 10 for identification, as of this date.)
16     Q. Mr. Han, you have before you what's
17 been marked as Defendant's Exhibit 10. And I
18 ask you, have you ever seen that document
19 before?
20     A. No.
21     Q. Okay. Are you aware that documents
22 have been produced by Artisan in response to
23 requests served by All Granite?
24     A. Yes.
25     Q. Okay. Were you involved in that
```
TSG Reporting - Worldwide   877-702-9580

Page 28

```
1                  Han
2  search for documents?
3      A. Say it again?
4      Q. Were you involved, were you one of the
5  persons involved in collecting documents in
6  response to All Granite's requests?
7      A. No.
8      Q. Who collected the documents for All
9  Granite -- correct myself. Who collected
10 documents for Artisan?
11     A. Who collects the documents for
12 Artisan.
13         Office clerk, regional sales manager.
14     Q. Let me stop for a second. The office
15 clerk, is that a he or she?
16     A. She.
17     Q. What is her name?
18     A. Kathy.
19     Q. Kathy.
20         You mentioned a sales manager?
21     A. Joe.
22     Q. Joe. And what is Joe's last name?
23     A. Joe Amabile.
24     Q. Okay. Did anyone else collect
25 documents?
```
TSG Reporting - Worldwide   877-702-9580

Page 29

```
1                  Han
2          MR. MALTBIE: Objection to form.
3      A. I don't know.
4      Q. Okay. Who oversaw the process of
5  collecting documents?
6          MR. MALTBIE: Objection to form.
7      Q. You can answer the question.
8      A. I don't know.
9      Q. Did you oversee the process?
10     A. I didn't.
11     Q. Mr. Amabile, had he ever overseen the
12 process of collecting documents?
13     A. I can't answer for him.
14     Q. I would like to go through a few of
15 these requests. We'll touch on some different
16 topics. Let me draw your attention to Request
17 Number 4.
18         Can you read that request.
19         (The witness read.)
20     A. Okay.
21     Q. Are there any documents in All
22 Granite's possession which would reflect a
23 relationship between Artisan and All Granite?
24         MR. MALTBIE: Objection, form.
25     Q. Let me be a little more particular.
```
TSG Reporting - Worldwide   877-702-9580

Page 30

```
 1              Han
 2   Q. Are there any documents in Artisan's possession
 3   which indicate an authorized dealer relationship
 4   between the two companies?
 5   A. Invoices.
 6   Q. Beyond invoices, are there any sort of
 7   agreements between the two companies?
 8   A. On the paper?
 9   Q. On paper, correct.
10   A. No.
11   Q. Let me refer your attention to Request
12   Number 6. I ask you to read that request.
13         (The witness read.)
14   Q. Are you aware of any documents
15   indicating the termination of the relationship
16   between All Granite and Artisan?
17   A. Say that again?
18   Q. Is there any written documentation
19   indicating the termination of the relationship?
20   A. Termination.
21   Q. Termination, correct.
22   A. No.
23   Q. How was the relationship terminated,
24   if in fact it was?
25   A. It never has been until we send you
```
TSG Reporting - Worldwide   877-702-9580

Page 31

```
 1              Han
 2   the cease-and-desist letter.
 3   Q. Okay. Thank you.
 4         Let me refer your attention to Request
 5   Number 10.
 6   A. Page?
 7   Q. Page 6, Request Number 10.
 8   A. Okay.
 9   Q. Does Artisan have any documentation
10   with respect to its alleged consumer complaints?
11   A. I don't know.
12   Q. Who would know that?
13   A. Joe.
14   Q. Thank you.
15         Let me refer your attention to Request
16   Number 16, appearing on page 8.
17         Do you know the identity of the
18   manufacturer of Artisan sinks?
19   A. Yes.
20         (Transcript continues in
21   attorneys'-eyes-only section.)
22
23
24
25
```
TSG Reporting - Worldwide   877-702-9580

Page 32

```
 1         Han - Attorneys' Eyes Only
 2   Q. Who manufactured Artisan sinks?
 3         MR. MALTBIE: This portion of the
 4   transcript designated attorneys eyes only,
 5   please.
 6   A. Kehuaxing Hong Kong Distribution, LLC.
 7   Q. Can you spell that for myself and the
 8   court reporter.
 9   A. K-E-H-U-A-X-I-N-G Hong Kong, LTD.
10   Q. Has that manufacturer been your source
11   of sinks for the whole time you've been in
12   business?
13   A. Yes.
14   Q. Do you know if they manufacture sinks
15   for any other companies?
16   A. Not in the United States.
17   Q. Which companies do they manufacture
18   sinks for outside the united States?
19         MR. MALTBIE: If you know.
20   Q. If you know.
21   A. No, I don't know.
22         (Transcript continues in
23   non-attorneys'-eyes-only section.)
24
25
```
TSG Reporting - Worldwide   877-702-9580

Page 33

```
 1              Han
 2   Q. Does Artisan have any engineering
 3   documents relating to the manufacture of its
 4   sinks?
 5   A. What do you mean?
 6   Q. Are there engineering specifications
 7   that are used by the manufacturer to build the
 8   sinks to a certain specification to meet certain
 9   criteria?
10   A. I think that's a public record. You
11   can go to IAPMO to search for documentation.
12   Q. Where would I go to search?
13   A. IAPMO.
14   Q. How do you spell that?
15   A. UPC certification. That's all
16   certified. In terms of the standard that you
17   can go to, they may ask for the standard.
18   Q. Are there any documents relating to
19   the manufacture of Artisan sinks which were
20   withheld, as far as you know?
21   A. I don't know.
22         MR. MALTBIE: Objection, form.
23   Q. Okay. Let me refer your attention now
24   to Request Number 19, appearing on the top of
25   page 10.
```
TSG Reporting - Worldwide   877-702-9580

**Page 34**

Han

1  
2  You understand what that request is  
3  seeking? Do you understand that request?  
4  A. Number 19?  
5  Q. Number 19, correct.  
6  A. "Artisan objects to this request."  
7  Q. No, Request Number 19, above that.  
8  A. Oh.  
9  Q. Do you understand that request?  
10  A. Uh-huh. Yes.  
11  Q. Are you aware of any advertisements,  
12  brochures, fliers, anything else produced by All  
13  Granite which uses any of the Artisan  
14  trademarks?  
15  A. Say it again? I didn't understand.  
16  MR. SCHROEDER: Can you read it back.  
17  (The record was read back.)  
18  A. I don't know. I've seen the -- the  
19  coupons that All Granite gave out.  
20  Q. Okay. Do those coupons include any of  
21  the Artisan trademarks?  
22  A. No.  
23  Q. Is there any documentation which you  
24  have which you want -- let me start over.  
25  Do you have any documentation which  

TSG Reporting - Worldwide   877-702-9580

**Page 35**

Han

1  
2  has not yet been produced which would show All  
3  Granite using an Artisan trademark on an  
4  advertisement, a flier, a brochure?  
5  MR. MALTBIE: There's going to be a  
6  supplemental correction later today. We're  
7  just waiting to get it, and there should be  
8  something in there on that issue. That  
9  goes more to the investigation side. So  
10  it's something you might want to bring up  
11  with Joe on Thursday.  
12  MR. SCHROEDER: Fair enough.  
13  MR. MALTBIE: Even if we take a break,  
14  you know, I can see if we have it yet.  
15  Q. But in terms of the question, Mr. Han,  
16  are you aware of any documents originating with  
17  All Granite which use the Artisan trademarks in  
18  any manner?  
19  A. Other than what he refers about --  
20  Q. Correct. Are you --  
21  A. No.  
22  Q. Let me ask you to look, if I could, at  
23  Request Number 20.  
24  Now, for the record, I'll state that  
25  we received a report from Abacus security with  

TSG Reporting - Worldwide   877-702-9580

**Page 36**

Han

1  
2  respect to an investigation conducted at the  
3  request of Artisan.  
4  Other than the report provided to us,  
5  are there any other reports in Artisan's  
6  possession --  
7  MR. MALTBIE: Objection to form.  
8  Q. -- that relate to a -- an  
9  investigation done by an outside firm, whether  
10  it's an investigation firm, or other such  
11  entity?  
12  MR. MALTBIE: Objection to form.  
13  A. Could you say it again? I'm sorry.  
14  MR. SCHROEDER: Could you read back  
15  the question, please.  
16  (The record was read back.)  
17  A. I don't know, because I'm not in  
18  charge of the documents.  
19  Q. Thank you.  
20  Do you know whether Artisan has  
21  invoices in its custody relating to the  
22  investigations done by the prior investigator?  
23  A. We have invoices from All Granite and  
24  gave it to us. And other than that, I don't  
25  know rest of the documents.  

TSG Reporting - Worldwide   877-702-9580

**Page 37**

Han

1  
2  Q. Thank you.  
3  Can I refer your attention to Request  
4  Number 24.  
5  Is there any written documentation  
6  which Artisan uses to qualify a dealer as an  
7  authorized Artisan dealer?  
8  A. I don't know if we print out any  
9  documents. We do credit checks, that kind of  
10  thing, but I don't know if we print out or not.  
11  Q. Are you personally involved with  
12  qualifying dealers as authorized Artisan  
13  dealers?  
14  A. Could you say it again, the question?  
15  MR. SCHROEDER: Can you read back the  
16  question, please.  
17  (The record was read back.)  
18  A. Personally involved, qualifying.  
19  Q. Well, let me ask you this: Is Joe  
20  more intimately involved with that process? Is  
21  Joe the person --  
22  A. Salesperson usually more involved  
23  qualifying, and in the corporate level, we do a  
24  credit check. That's what we do.  
25  Q. Are you familiar with the process  

TSG Reporting - Worldwide   877-702-9580

Page 38

```
 1                    Han
 2   which is used to qualify a dealer as an
 3   authorized Artisan dealer?
 4       A.  Yes.
 5       Q.  Can you explain the process in general
 6   to me.
 7       A.  Basically, look at them, their
 8   showroom, talk to them about basic concept of
 9   selling sinks, and to get idea of what kind of
10   selling concepts they have, and look at their
11   credit history, so -- that's it.
12       Q.  Have you ever terminated any
13   relationships with dealers?
14       A.  Yes.
15       Q.  Other than for credit reasons, have
16   you terminated any relationships with authorized
17   dealers?
18       A.  Yes.
19       Q.  Can you give me an example of a reason
20   why you terminated a relationship with an
21   authorized dealer.
22       A.  In one instance, we terminated because
23   they carry competitive products.
24           (Transcript continues in
25   attorneys'-eyes-only section.)
         TSG Reporting - Worldwide   877-702-9580
```

Page 39

```
 1         Han - Attorneys' Eyes Only
 2       Q.  Do you know the name of that dealer,
 3   the identity of that dealer?
 4       A.  I don't --
 5       Q.  If you know.
 6       A.  I know, but I don't want to disclose
 7   that.
 8       Q.  Well, if you know, you've got to --
 9       A.  This is a business.  Secret.
10           MR. MALTBIE:  We can designate this as
11   attorneys eyes only.
12       Q.  We can designate as attorneys eyes
13   only.
14       A.  A Direct Distribution.
15       Q.  How do you spell that?
16       A.  A, and Direct, Distribution.
17           (Transcript continues in
18   non-attorneys'-eyes-only section.)
19
20
21
22
23
24
25
         TSG Reporting - Worldwide   877-702-9580
```

Page 40

```
 1                    Han
 2       Q.  Okay.  Are there other instances where
 3   you terminated a dealer for other than non- --
 4   other than credit reasons?
 5       A.  There are many ways of terminating
 6   a -- dealers, because you can't terminate a
 7   dealer based on, you know, selling style or
 8   something.  But we will -- those are the
 9   customers we have, will have less attention from
10   our salespersons.  Basically we will have no
11   visits from our salespersons, and -- and
12   eventually they will die away.
13       Q.  Who makes the decision to terminate a
14   dealer?
15       A.  I will.  Or actually, we do have
16   another customer that we terminated.  I think --
17   what's the other guy's name?  I can't remember
18   the name.
19       Q.  What was the reason for that
20   termination, if you know?
21       A.  Basically very hard to deal with and
22   not -- cannot get along with my customer service
23   people, and that kind of sort of thing.
24       Q.  Do you know the location, New York,
25   New Jersey?
         TSG Reporting - Worldwide   877-702-9580
```

Page 41

```
 1                    Han
 2       A.  I think it's in New York.
 3       Q.  Thank you.
 4           And let me finally direct your
 5   attention to Request Number 27.  I ask you to
 6   read that request.
 7       A.  Artisan objects to....
 8           (The witness read.)
 9       A.  Okay.
10           All right.
11       Q.  Do you have any documents in your
12   possession which would substantiate that
13   allegation?  For example, do you have any
14   comparative trade articles which compare Artisan
15   sinks to Kohler, Blanco, or Elkay?
16       A.  No.
17       Q.  Are you aware of whether any such
18   articles exist?
19       A.  No.
20       Q.  Thank you.
21           MR. SCHROEDER:  Go ahead and mark the
22   next document as Defendant's Exhibit 11.
23           (Interrogatories was marked
24   Defendant's 11 for identification, as of
25   this date.)
         TSG Reporting - Worldwide   877-702-9580
```

Page 42

Han

Q. Mr. Han, could I ask you to look at page 3, Interrogatory Number 1. And I would ask you to read that interrogatory to yourself.
(The witness read.)
A. Okay.
Q. Do you understand the substance of interrogatory -- do you understand what was requested?
A. I never -- I don't understand interrogatory, that word.
Q. You understand -- but do you understand the information that's requested from you?
A. What information?
Q. The information that's requested in that sentence, appearing below Interrogatory Number 1.
A. Okay.
Q. Okay.
Could I ask you now to refer to the answer which appears on page 4?
(The witness read.)
Q. Okay.
A. Okay.

TSG Reporting - Worldwide   877-702-9580

Page 43

Han

Q. Okay. Appearing on page 4 are six names. Is that correct?
A. Right.
Q. Who are these six names, if you know?
A. Who are these six names?
    MR. MALTBIE: Objection to form.
A. Consumers.
Q. Okay. Consumers.
And in particular, these consumers who complained about -- let me rephrase that.
Did these consumers contact Artisan with complaints?
    MR. MALTBIE: Objection, form.
    You can answer if you know.
A. I don't know that question.
Q. Did you yourself speak to any of these consumers listed here in response to Interrogatory Number 1?
A. No.
Q. Do you know if there's any written documentation of the substance of the communication between the individual named and Artisan?
A. Written document? What -- say it

TSG Reporting - Worldwide   877-702-9580

Page 44

Han

again?
Q. Let me rephrase that.
Were there any notes taken of the contact between Artisan and these individuals?
A. I don't know.
Q. Do you know who these individuals spoke to at the company?
A. They usually spoke to Joe. That's I can think of.
Q. Okay. Do you know when -- and by when, I mean date. Do you know when these conversations took place?
If you know.
A. I don't remember.
Q. In the last month, last six months?
A. Well --
Q. If you know.
A. Rough day is -- the first week or -- before we contacted this law firm.
Q. Okay.
A. But that's -- rough idea.
Q. That's fair.
Okay. Let me refer you to Interrogatory Number 9.

TSG Reporting - Worldwide   877-702-9580

Page 45

Han

Could I ask you to read the request. I'm going to ask you to read the request.
A. Out loud, or --
Q. No, no, read to yourself.
(The witness read.)
A. Okay.
Q. And could I ask you to read the answer to Interrogatory Number 9 which appears on page 8.
A. Okay.
Q. Are you the individual responsible for the conception of the Artisan mark as this interrogatory states?
A. Yes.
Q. The name originated with you, Artisan?
A. Yes.
Q. Do you recall how you created that name?
A. Yes. One day we visit, me and my wife visited Artisinal restaurant down on 32nd Street, Park Avenue.
Q. What restaurant?
A. Artisinal.
Q. How do you spell that?

TSG Reporting - Worldwide   877-702-9580

Page 46

```
 1                    Han
 2     A.  A-R-T-I-S-I-N-A-L.  That's a cheese
 3  company.  And we loved the restaurant over
 4  there, and -- and the -- we go to Google it, and
 5  changed it to Artisan.  That's it.
 6     Q.  Were you the person responsible for
 7  creating the fleur-de-lis logo?
 8     A.  Yes.
 9     Q.  You alone?
10     A.  No.  We have graphic designers, that
11  kind of thing.
12     Q.  Internally inside the company?
13     A.  Outside.
14     Q.  Who did you use -- who did you work
15  with to create the fleur-de-lis logo?
16     A.  A designing company in China.
17     Q.  Are there any -- is there any
18  documentation to reflect that design work?
19     A.  I don't think I can find the document
20  because my computer got fried, so that's a long
21  time ago.  There's -- it has been e-mail back
22  and forth on, you know, modifications, all that
23  kind of stuff, but computer got fried and the
24  e-mail is not saved.
25     Q.  Would the company in China have any
```
TSG Reporting - Worldwide    877-702-9580

Page 47

```
 1                    Han
 2  documents to reflect when the fleur-de-lis was
 3  created?
 4     A.  I don't know.  It has been a long time
 5  ago.  It's 2003.
 6     Q.  Is that company still in business, as
 7  far as you know?
 8     A.  I don't know.
 9     Q.  Do you have their name?
10     A.  I can find out.
11     Q.  Okay.  I would ask that you --
12     A.  The contact list in my computer might
13  got fried, so I don't know if I have any name or
14  so.
15  RQ Q.  I would ask that you follow up with some
16  sort of documentation to indicate the name of the
17  designing company in China, if available.
18         MR. SCHROEDER:  Take a five-minute
19     break.
20         (Recess from 1:15 to 1:27.)
21  BY MR. SCHROEDER:
22         MR. SCHROEDER:  Let me start by
23     marking the following document as
24     Defendant's Exhibit 12.
25         (Document was marked Defendant's 12
```
TSG Reporting - Worldwide    877-702-9580

Page 48

```
 1                    Han
 2     for identification, as of this date.)
 3     Q.  Mr. Han, you have before you what's
 4  been marked as Defendant's Exhibit 12.  Do you
 5  recognize this document?
 6     A.  No.
 7     Q.  Well, let me refer your attention to
 8  the last page, which follows page 8.
 9     A.  Page 8?
10     Q.  Turn to page 8, the following page.
11  Turn to page -- one more page over.
12     A.  Okay.
13     Q.  Is that your signature there?
14     A.  Yeah.
15     Q.  Okay.  So let me ask again, have you
16  seen this document before?
17     A.  Not really through.
18     Q.  All right.  Let's walk through it now,
19  then.  Let me direct your attention to paragraph
20  2 on page 1.
21     A.  Okay.
22     Q.  When exactly in 2003 did Artisan
23  start?  Do you remember the month?
24     A.  May.
25     Q.  May of 2003?
```
TSG Reporting - Worldwide    877-702-9580

Page 49

```
 1                    Han
 2     A.  Yes.
 3     Q.  Did you start in the same location
 4  that you're at right now?
 5     A.  No.
 6     Q.  Where did you start?  What was the
 7  location?
 8     A.  Brooklyn.
 9     Q.  And when did you move to Newark?
10     A.  This year.
11         Last year, sorry.
12     Q.  2007.
13     A.  Yeah, 2007, April.
14     Q.  April 2007.
15     A.  Yeah.
16     Q.  What was the reason for the move?
17     A.  Just to -- the warehouse is over
18  there, so I'd be there.
19     Q.  Is your office close to your
20  warehouse?
21     A.  It's together.
22     Q.  Paragraph 2 contains the statement
23  that Artisan is considered a premium
24  top-of-the-line sink manufacturer.
25         What is the basis for that statement,
```
TSG Reporting - Worldwide    877-702-9580

Page 50

1  Han
2  if any?
3    A. Premium. Number 1, the customer
4  willing to pay more for the quality that we make
5  because of the brand recognition, due to the
6  advertising that we do, and the trade
7  recognition from my competitors. When they
8  visit your showroom, when they visit your
9  location, in the trade show.
10   Q. Okay. Explain to me what's taken
11 place at trade shows in the past.
12       MR. MALTBIE: Objection to form.
13   A. What did you specify? I mean --
14   Q. Well, you just testified that you had
15 contact at trade shows which would lead you to
16 believe that you're offering a premium product.
17 What kind of contact have you had at these trade
18 shows that would lead you to believe that?
19   A. In the trade shows, you're on the same
20 stage as other competitors, and you are
21 rendering the same -- not same amount of space,
22 but substantial amount of space in the trade
23 show, and the -- compared to your competitors,
24 has been in business for 30, 50 years, that sort
25 of thing.

TSG Reporting - Worldwide    877-702-9580

Page 51

1  Han
2    And your advertising is as nice as
3  anybody else.
4    Q. Do you have any documentation,
5  comparative trade articles, which compare your
6  brand to other manufacturers of sinks?
7    A. No.
8    Q. Are you aware of any comments made by
9  a manufacturer, such as Kohler, Blanco, or
10 Elkay, concerning an Artisan sink?
11   A. Say it again?
12   Q. Has -- let me rephrase the question.
13     Has the company such as Kohler,
14 Blanco, or Elkay ever commented on the quality
15 of an Artisan sink, as far as you know?
16   A. Their sales reps have come to my booth
17 and, you know, say it's nice. The first year,
18 Elkay, when we were doing business in 2003 --
19 and Elkay come along and say; You know what?
20 You got nice sink here.
21   Q. And that would have been a sales rep
22 of Elkay?
23   A. Sales rep, yeah.
24   Q. And that took place at a trade show.
25   A. Yes.

TSG Reporting - Worldwide    877-702-9580

Page 52

1  Han
2    Q. Do you recall what trade show that
3  was?
4    A. Kitchen and Bath Show.
5    Q. Kitchen and Bath Show.
6    A. Yeah.
7    Q. Is that an annual event?
8    A. Yes.
9    Q. When does that take place?
10   A. Typically April and May.
11   Q. April and May.
12   A. Yeah.
13   Q. Where does it take place?
14   A. Three locations, like Las Vegas,
15 Chicago and Orlando.
16   Q. And it alternates?
17   A. It alternates.
18   Q. I was going to say from year to year
19 it alternates.
20   A. Yeah.
21   Q. How big a trade show is that, if you
22 know?
23   A. The largest in the industry.
24   Q. Okay. Have you attended every year
25 since 2003?

TSG Reporting - Worldwide    877-702-9580

Page 53

1  Han
2    A. Yes.
3    Q. What's the purpose of going to a trade
4  show like that?
5    A. To promote the brand.
6    Q. Do you sell sinks from attending a
7  trade show?
8    A. No.
9    Q. Do potential dealers attend these
10 trade shows to decide which brand sink they
11 might want to carry?
12   A. They do.
13   Q. Have you ever spoken to a dealer at a
14 trade show about carrying your brand of sink?
15   A. Yes.
16   Q. Did you personally have these
17 conversations?
18   A. Yes.
19   Q. Could you give me an example of such a
20 conversation, if you recall.
21   A. Well, basically, they ask, you know,
22 what gauge of material, what kind of sinks did
23 you have, you know. Dealers in this location,
24 or that kind of thing.
25     And then they would say, you know

TSG Reporting - Worldwide    877-702-9580

Page 54

Han

1  what, after I've done the whole sales pitch and
2  they understand -- most understand we don't give
3  out pricing information in the trade show, so
4  we'll basically go back and look at their
5  credit, thing, and send them the pricing.
6
7    Q. Do you have dealers outside of the
8  New York, New Jersey area?
9    A. Yes, we do.
10   Q. Do you have dealers nationwide
11  throughout the United States?
12   A. Yes.
13   Q. Is New Jersey, New York your biggest
14  area of sales, if you know?
15   A. If you combined New Jersey and
16  New York, then yes. But just New York, or
17  New Jersey, no.
18   Q. What is your biggest concentration of
19  sales in the U.S., if you know, or where is your
20  biggest concentration of sales in the U.S.?
21   A. Has been an average of -- sometimes up
22  and down. It has been Florida, 2006 pretty
23  well, very well. New York has been pretty good.
24  Massachusetts has been very good. Texas has
25  been very good.

TSG Reporting - Worldwide    877-702-9580

Page 55

Han

1
2    Q. Texas?
3    A. Yeah. So any -- like big states are
4  substantial, yes.
5    Q. Okay. Thank you.
6      Let's go back to your declaration and
7  take a look at paragraph 3.
8      Paragraph 3 states that Artisan was
9  among the first sink manufacturers to finish
10  using heavy 16-gauge stainless steel.
11   A. Yes.
12   Q. What is the basis for that statement?
13   A. Basically, compared to my competitors,
14  Blanco, Franke and Elkay, they have yet to start
15  using 16 gauge. So the majority of the market
16  has not started using 16 gauge yet.
17   Q. So is that statement based on your own
18  observations? For example, the sinks you see at
19  trade shows, your own personal observations of
20  other companies' sinks?
21   A. That's correct.
22   Q. Okay. Thank you.
23     Later on in paragraph 3 it states that
24  Artisan uses the largest sound-deadening pads in
25  the industry and puts pads on all sides of the

TSG Reporting - Worldwide    877-702-9580

Page 56

Han

1
2  sink. What's the basis for that statement?
3    A. Well, again, compared to Blanco,
4  Franke, and all the brand names that has
5  existing in the market for many years, in our --
6  some deadening pad are larger, and that --
7  because it covers the whole bottom of the sink,
8  and also we have four sides have pads, and some
9  of them, they don't -- competitors don't spray
10  their sink, to cut costs, and we do both.
11   Q. Have you ever analyzed competitive
12  sinks? Other than All Granite, have you ever
13  analyzed a Kohler sink or an Elkay sink?
14   A. Yeah.
15   Q. Internally within the company?
16   A. Yes.
17   Q. Have you ever sent someone outside for
18  analysis, to an outside engineering firm?
19   A. There's no need for it, because all of
20  them, they have the same UPC certification as I
21  do.
22   Q. Okay.
23   A. So, assume they following the same
24  engineering standard.
25   Q. Who in the company would be the person

TSG Reporting - Worldwide    877-702-9580

Page 57

Han

1
2  who would have compared these sinks and analyzed
3  these competitive sinks? Would that be Joe?
4    A. Analyzing, comparing the sinks, we --
5  we laid it all up, and then we just compare it.
6    Q. So you were involved in that process
7  as well.
8    A. Yes.
9    Q. Was Joe involved in that process?
10   A. Joe -- yes.
11   Q. Anyone else besides yourself and Joe?
12   A. Chuck.
13   Q. Who is Chuck?
14   A. Sales manager.
15     Nation -- national sales manager.
16   Q. Does he have a higher level of
17  responsibility in the company than Joe?
18   A. Yeah.
19   Q. Does Joe report to Chuck?
20   A. Yes.
21   Q. Do you have sales managers in other
22  regions of the country?
23   A. No.
24   Q. What area does Chuck cover, if you
25  know? Which sales area?

TSG Reporting - Worldwide    877-702-9580

Page 58

Han

2  A. He's a national sales manager. Means
3  he travels to each regions, talk to the
4  salesperson over there, independent, or
5  distributor firm, to help to promote the sinks.
6  Q. So Chuck is nation wide. What region
7  does Joe cover?
8  A. New York, New Jersey -- New Jersey,
9  Pennsylvania, and sometimes we need him for
10 nation -- you know, other spots in the nation,
11 and we send him over to.
12 Q. Okay. So other than Joe, does the
13 company employ other sales reps across the
14 nation?
15 A. Yes. We have another salesperson in
16 Chicago.
17 Q. What is his name?
18 A. Brandi.
19 Q. Brandi?
20 A. Brandi.
21 Q. How would you spell that?
22 A. B-R-A-N-D-I.
23 Q. So Brandi is a woman?
24 A. Yes.
25 Q. And she covers strictly the Chicago

TSG Reporting - Worldwide   877-702-9580

Page 59

Han

2  area?
3  A. Right. And we also have -- used to
4  have a 1099 employee that covers out of
5  Maryland, and we give him -- we -- once we
6  changed to distributorship instead of a
7  salesperson, we give it to -- this person works
8  for our distributor currently, which means he
9  still sells our sinks, but just different
10 employer right now.
11 Q. Okay. Besides those two people, are
12 there other sales reps around the country?
13 A. Yes.
14 Q. How many more?
15 A. Ten, extra 10, 12. Sales firm. And
16 the highest time we have like 15 or something,
17 around 15.
18 Q. Okay. Let me refer your attention to
19 paragraph 4 of your declaration. Paragraph 4
20 refers to German sanding equipment.
21     Paragraph 4.
22     The second sentence refers to German
23 sanding equipment.
24 A. Let's rephrase this.
25     THE WITNESS: Can we?

TSG Reporting - Worldwide   877-702-9580

Page 60

Han

2  A. It's -- more is a German sanding
3  technology.
4  Q. Okay, German sanding technology.
5  A. Right.
6  Q. That technology is used by your
7  manufacturer in China?
8  A. That's correct.
9  Q. So the sanding is done in China before
10 the sinks are shipped to the United States?
11 A. That's correct. Yes.
12 Q. The technology used by your Chinese
13 manufacturer, to the best of your knowledge, is
14 that the same technology used by brands such as
15 Bosch, KitchenAid, Subzero?
16 A. The sanding pad, the finest, the
17 sanding pad, that is yes. The sanding process
18 might be different, because they are sanding
19 flat surfaces, versus we sanding a bowl.
20     So the machine that is used will be
21 different, but the technology, the basic
22 philosophy and the sanding pad are used, it
23 should be the same.
24 Q. What is the philosophy, if you can
25 explain it to me?

TSG Reporting - Worldwide   877-702-9580

Page 61

Han

2  A. Basically the -- I think the -- the
3  control unit itself, for the -- the machinery,
4  that is a -- a computer control. So that
5  imported to China. So basically, that's what I
6  said.
7      The brain is the same.
8  Q. Okay. As far as you know, does
9  Kohler, Elkay or Blanco use such sanding
10 technology?
11 A. Well, every company could use
12 different ones, but the result is -- might be
13 either same or similar.
14 Q. Let me follow up on that question.
15     So fixed income example, a sink from
16 Kohler, would it have the brush strokes that --
17 or would have similar brush strokes as the brush
18 strokes which appear on an Artisan sink, to the
19 best of your knowledge?
20 A. Similar.
21 Q. Okay. That same paragraph, you speak
22 to this idea of having the tightest edge
23 radiuses in your sinks.
24 A. Right.
25 (Continued in attorneys'-eyes-only section.)

TSG Reporting - Worldwide   877-702-9580

Page 62

1    Han - Attorneys' Eyes Only
2    Q.  Can you explain to me how that is
3    accomplished, if you know.
4        THE WITNESS: For -- your own --
5        MR. MALTBIE: For attorneys eyes.
6    Let's designate this attorney eyes only,
7    please.
8    A.  Because this is getting into the
9    manufacturer sinks process.
10   Q.  Agreed.
11   A.  It's for heavy -- it's used another
12   mold to press the second time.
13   Q.  Mold to press the second time.
14   A.  Yeah. So which means it involves more
15   labor in terms of changing the mold and setting
16   up the machine and all that kind of stuff.
17   Q.  To the best of your knowledge, do any
18   other manufacturers use that type of technology
19   to create tight radiuses?
20   A.  Some of the Chinese companies are --
21   tried to copy that, but in terms of Elkay,
22   Blanco, the brand names that already exist, they
23   haven't caught up.
24   Q.  So at this point, the radiuses in the
25   Artisan sinks are tighter than the radiuses in

TSG Reporting - Worldwide    877-702-9580

Page 63

1    Han - Attorneys' Eyes Only
2    Elkay and Blanco.
3    A.  That is right.
4    Q.  What about Kohler?
5    A.  Same.
6    Q.  The radiuses are the same as
7    Kohler's --
8    A.  No, we are tighter than Kohler.
9    Q.  Tighter than Kohler.
10   A.  Yes.
11       (Transcript continues in
12   non-attorneys'-eyes-only section.)

TSG Reporting - Worldwide    877-702-9580

Page 64

1    Han
2    Q.  Okay. Let me refer you now to
3    paragraph 14 of this declaration. Okay?
4        The first sentence states that Artisan
5    learned from All Granite customers that All
6    Granite was still displaying Artisan brand
7    sinks. And sinks is plural.
8        Are you aware of there having been
9    more than one sink on display in an All Granite
10   showroom? And by sink, I mean an Artisan sink.
11   A.  I don't know --
12   Q.  Your PI located one Artisan sink on
13   display in the South Plainfield showroom. Were
14   you aware of any other sinks being on display,
15   any Artisan sinks?
16   A.  I don't know.
17   Q.  Okay. Turning to page 6. Top of the
18   page, your declaration says that customers of
19   All Granite began contacting Artisan to purchase
20   accessories for the sinks and to report problems
21   with the sinks.
22       Do you have any firsthand knowledge
23   about the reports of these customers?
24   A.  No.
25       MR. MALTBIE: Objection to form.

TSG Reporting - Worldwide    877-702-9580

Page 65

1    Han
2    Q.  Okay. Are you familiar with the
3    problems that were reported with the sinks?
4        Was that a question for Joe?
5    A.  That's a question for Joe, yes.
6    Q.  Let me refer you to paragraph 15, to
7    the last sentence, which states, "The actual
8    sink installed is not an Artisan brand sink, but
9    instead is an inferior sink that bears a
10   fleur-de-lis design that is obviously intended
11   to mimic Artisan's fleur-de-lis design mark."
12       Do you see that?
13   A.  Uh-huh.
14   Q.  What is the basis for stating that the
15   sink that is installed is an inferior sink?
16   A.  The logo looks similar.
17   Q.  Oh, and let me -- let me drive that
18   question.
19       I'm not asking you about your
20   allegations of infringement, that your
21   allegation that the Artisan -- the allegation
22   that the All Granite sink is inferior. What is
23   the basis for that allegation, that the All
24   Granite sink is inferior to the Artisan sink, if
25   you know?

TSG Reporting - Worldwide    877-702-9580

Page 66

Han

1  A. I don't know. I don't know the
2  question, no.
3  Q. I'm sorry?
4  A. I don't know your question.
5  Q. Let me rephrase it then.
6  That last sentence, let's look back at
7  that last sentence, says, "The actual sink
8  installed is not an Artisan brand sink, but
9  instead is an inferior sink."
10 A. Okay.
11 Q. Why do you refer to the All Granite
12 sink as inferior?
13 A. The size, dimension, the logo, looks
14 similar.
15 Q. Thank you.
16 Let me ask you just to refer to
17 paragraph 9, and then I'm going to mark another
18 document, which will be Defendant's Exhibit 13.
19    (Collection of reports covering the
20    period of 2007, 2006, and 2005, Bates
21    numbers 3 to 16, was marked Defendant's 13
22    for identification, as of this date.)
23 Q. Mr. Han, you have before you what's
24 been marked as Defendant's Exhibit 13. And it

TSG Reporting - Worldwide   877-702-9580

Page 67

Han

1  is a collection of what appears to be reports,
2  which cover the period of time 2007, 2006, and
3  2005. It comprises Bates numbers 3 to 16.
4  Are you familiar with this document?
5  A. Yes.
6  Q. Have you seen this document before?
7  A. Yes.
8  Q. Can you explain to me what this
9  document is.
10 A. Basically, a sales -- from Stephens to
11 our company. I mean sales means service.
12 Q. Who is C.C. Stephens?
13 A. Our advertising company. Public
14 relation advertising.
15 Q. Are they the only public relation
16 advertising company that you use?
17 A. Yes.
18 Q. So this report should encompass all
19 expenses with respect to public relations and
20 advertising.
21    MR. MALTBIE: Objection to form.
22 A. I don't know, because might be some
23 others, might be -- I mean, probably -- should
24 be close.

TSG Reporting - Worldwide   877-702-9580

Page 68

Han

1  Q. Okay. Fair enough.
2  Now, in paragraph 9 of your
3  declaration, you refer to Artisan having spent,
4  you say, more than 400,000 since 2003 in
5  advertising.
6  A. Right.
7  Q. Okay. Now, does this document provide
8  any of the basis for that number? If you sum up
9  the figure from 2005, 2006 and 2007, I believe
10 you come up with a number fairly close to
11 $400,000.
12 Is that where that figure derives from
13 in your declaration?
14 A. That is correct.
15    MR. SCHROEDER: Let me mark this next
16    document as Defendant's Exhibit 14.
17    (Compilation of amounts of money spent
18    Artisan spent on marketing sinks was marked
19    Defendant's 14 for identification, as of
20    this date.)
21 Q. Mr. Han, you've been given what's been
22 marked as Defendant's Exhibit 14. Do you
23 recognize that document?
24 A. Right.

TSG Reporting - Worldwide   877-702-9580

Page 69

Han

1  Q. Can you tell me what that document is.
2  A. Basically, compiled all the dollar
3  amount that we spend on marketing our sinks.
4  Q. So if we look back at Defendant's
5  Exhibit 13 -- and for example, we look at the
6  year 2007, we look at page 9, which is the sum
7  of expenses. 2007, the sum is 292,423.
8  Where does that number, and how does
9  that number appear --
10 A. 298,000 -- which -- which number are
11 you looking at?
12 Q. If you refer to this document, which
13 is Defendant's 13, for example, just look at
14 page 9, which is the summary for the year 2007,
15 that summary is 292,000 and change.
16 A. Right.
17 Q. How was that number transposed over to
18 Document Number 14, Defendant's 14?
19 A. Okay. Basically, advertising means we
20 do it on the trade publications, consumer
21 publications, but also there's part of expenses
22 that doing advertising others, means designs,
23 works, and other related costs that -- photo
24 shoots, and all that kind of stuff.

TSG Reporting - Worldwide   877-702-9580

Page 70

Han

2  So Stephens is just part of the costs,
3  but there's other costs involving marketing, so
4  the two not going to be exact.
5      Q. Okay. But I guess my question is,
6  this 292,000 number is bigger than any number in
7  the column appearing on 2007.
8      So have you broken that number down --
9      A. Yeah.
10     Q. Okay. So some of the costs incurred
11 through Stephens --
12     A. Are just probably advertisings, and
13 then some of them put into advertising others.
14     Q. Advertising others.
15     A. Yes.
16     Q. And you said advertising other was
17 directed to what?
18     A. Directed to probably photo shoots,
19 designs, design works, public relation works.
20 You know, any other stuff that is related to
21 promoting the brand and the sinks.
22     Q. Okay. Do you do any radio or
23 television advertising?
24     A. No.
25     Q. So the advertising is -- is limited to

TSG Reporting - Worldwide   877-702-9580

Page 71

Han

2  print advertising.
3      A. That is correct.
4      Q. This one column on the sheet, Travel,
5  what does that encompass?
6      A. Trade shows, travel to trade shows,
7  traveled to promote the sinks, promote to
8  dealer, the distributor, customers, that kind of
9  thing.
10     Q. So those charges are strictly airline,
11 hotel charges, food charges?
12     A. That's correct.
13     Q. I refer you back to your declaration,
14 paragraph 9. And the second sentence which
15 says, "Artisan has spent more than $400,000
16 since 2003."
17     That reference to 2003, when we look
18 back at Exhibit 14, is going to include
19 primarily trade shows for those first two years.
20     A. Right.
21     Q. We have a trade show expense of a
22 little over 11,000, 2003. Trade show expense of
23 approximately 2,000 in 2004. Advertising,
24 other.
25     A. Right.

TSG Reporting - Worldwide   877-702-9580

Page 72

Han

2      Q. 14,000. Okay.
3      Do you recall what the $460,000
4  expense was in 2003 for advertising?
5      A. It's just brochures.
6      Q. And again, 2004, you spent $774.
7  Would that also be brochures?
8      A. I believe so.
9      Q. Okay. Can you tell from Defendant's
10 Exhibit 13 whether the fleur-de-lis logo is
11 included on all of these fliers, brochures,
12 advertisements? Is there a way for you to know
13 whether --
14     A. Everything.
15     Q. -- everything has a fleur-de-lis on
16 it?
17     A. That's right.
18     Q. It does.
19     A. Yes.
20     Q. Is there a way for you to confirm
21 that?
22     A. Basically if there's a brochure, we
23 have logos. We have labels, we have logos.
24 Public relation stuff that we sent out have
25 logos. Advertising brochure, we have logos. So

TSG Reporting - Worldwide   877-702-9580

Page 73

Han

2  basically, other than that, we don't do anything
3  else.
4      Q. To the best of your knowledge, has the
5  fleur-de-lis appeared on or in every
6  advertisement that you've produced since 2003?
7      A. Yes.
8      MR. SCHROEDER: Let me mark the
9  following document as Defendant's Exhibit
10 15.
11     (Artisan 2008 Media Schedule and
12 Artisan 2007 Media Schedule were marked
13 Defendant's 15 for identification, as of
14 this date.)
15     Q. Mr. Han, have you seen these two pages
16 before?
17     A. Yes.
18     Q. Okay. They're entitled, "Artisan 2008
19 Media Schedule and Artisan 2007 Media Schedule."
20     A. Yes.
21     Q. Now, when you use the term "media,"
22 you're referring to print media, correct?
23     A. That's correct.
24     Q. And the first page, which is 2008,
25 these are projected advertising costs for this

TSG Reporting - Worldwide   877-702-9580