**Han**

**upcoming year, correct?**

A. Uh-huh.

**Q. Is that correct?**

A. Yes.

**Q. 2008, upcoming year.**

A. Yes.

**Q. And when we look at 2007, these are specific costs relating to your print media advertising.**

A. Right.

**Q. Now, are these costs included within the figures we looked at earlier?**

A. Yes.

**Q. From -- C.C. Stephens?**

A. C.C. Stephens, yes.

**Q. Just to be clear, the 292,000 summary for 2007 would include the numbers I see here on this sheet for 2007.**

A. Yes.

**Q. Okay. Thank you.**

MR. SCHROEDER: Let me mark the next document as Defendant's Exhibit 16.

(Artisan's internal accounting document reflecting the expenses of the

Han

company was marked Defendant's 16 for identification, as of this date.)

**Q. Mr. Han, you have before you what's been marked as Defendant's 16. Do you recognize this document?**

A. Yes.

**Q. Can you explain to me what it is. Generally.**

A. Well, that's my accounting stuff. General entries, stuff like that.

**Q. This is a document created internally within Artisan reflecting the expenses of the company?**

A. That is correct.

**Q. Are these all the expenses incurred by Artisan to this period of time, to the best of your knowledge?**

A. That is correct.

**Q. Okay. So these expenses include such expenses as charges by C.C. Stephens, travel charges --**

A. And more than that, because we have like a VNU business media is --

Sorry. We have -- when we look at

Han

VNU, business media, that's all the $500.

**Q. What page are you on?**

A. Page --

MR. MALTBIE: 230.

A. 12 out of 17.

**Q. Okay. 230. VNU business media, okay.**

A. They are print magazines.

**Q. Print magazines?**

A. Yes. They are pay on top of -- it's not included in the C.C. Stephens.

**Q. Okay. What exactly is a print magazine?**

A. Basically, we hire C.C. Stephens, I think it's a later -- the year, and some of the media plan has already done, so we still go through our own channel to place advertisements, that kind of thing.

So when you see VNU business media, it means we are paying the media directly. And when you see C.C. Stephens, in a later years, so we paying all the advertising and placement through C.C. Stephens. We are not paying anybody -- most company, we don't pay directly to them.

Han

**Q. Okay. Can you tell by looking at this what the charge was for?**

**Yes, there's a charge for VNU business media for $500.**

**Is there a way to tell what that $500 was spent for?**

A. Print advertising.

**Q. Print advertising.**

A. Yeah.

**Q. Okay. Do you know what magazine or --**

A. VNU produced Kitchen and Bath Business Magazine.

**Q. Where is that magazine distributed, if you know?**

A. All the showrooms.

**Q. Would that be a magazine that would be given to a consumer free?**

A. Of -- if they go to the showroom, yes, maybe. But usually it's for trade eyes only.

**Q. How about the company, BNT Media?**

A. It's the same thing. It's another media company. Yeah.

**Q. Could you take a look at Bates Number 231, page 13 of 17.**

Han

**I see some charges for the trade show in Vegas, Kitchen and Bath Industry Show.**

A. 17 of 17?

**Q. 13 of 17.**

A. Okay. Sorry.

Okay.

**Q. Okay. I see some charges for the Kitchen and Bath Industry Show.**

A. Yeah.

**Q. 10,900. Is that a charge for actually having a booth at the show?**

A. That is correct.

**Q. And the second charge --**

A. That is just part of the cost, because it's way more than 10,000.

**Q. Okay.**

A. It's usually split in half or something, to pay the -- place a deposit and then pay for the rest.

**Q. Uh-huh. What about the following charge, Field services for 17,000? What does that mean, if you know?**

A. Field services, Kitchen and Bath Show, basically that includes -- what date is that?

Han

2006. Okay. That's more like a -- you know, a -- assembling of booth for you, dismantle the booth for you. So they caught a few services. It means they have to send out people to your booth and taking care of hanging signs, all that kind of stuff. They call field services.

**Q. And then there's another charge for 16,150. Is that just an additional --**

A. Yeah.

**Q. That is an additional charge breaking up the total fee of the show costs?**

A. Yes.

**Q. Okay.**

**Below that, what is spiffs?**

A. Spiffs is basically when you give customer -- like say you go to a showroom and talk to their salesperson and ask them to promote their sinks. In industry, you will say, You know what? If you sell one of our sinks, we can give you $10, $5. It's called spiff. It's -- a motivations, incentive, stuff.

**Q. Uh-huh. Okay. Thank you.**

MR. SCHROEDER: Off the record for a

Han

second.

(Discussion off the record.)

(Luncheon recess at 2:06.)

Han

AFTERNOON SESSION

(2:49)

JIAN XIONG HAN

resumed, having been previously duly sworn by a Notary Public, was examined and testified further as follows:

CONTINUED EXAMINATION BY MR. SCHROEDER:

**Q. Before we took our break, we were talking about some of the advertising expenses that have been expended by Artisan. And just continuing on that theme, I was provided with a collection of documents showing various fliers, brochures, and that sort of thing.**

**And you just have to bear with me a little bit because some of this stuff wasn't stapled together, so I'm not sure that I know that I have a complete package.**

A. Okay.

**Q. But -- I only have one copy, so if you can look on, too, with --**

MR. MALTBIE: That's fine.

MR. SCHROEDER: Let's go ahead and mark this first flier, brochure, as

Han

Defendant's Exhibit 17. And that is actually Bates Number 43.

(Advertising for magazines, Bates-stamped 43, was marked Defendant's 17 for identification, as of this date.)

**Q. Mr. Han, just as a representative, a brochure, Defendant's Exhibit 17 -- well, let me ask you, what is Defendant's 17?**

A. It's advertising in place on the magazines. We place on the magazines, place with media.

**Q. And if I direct your attention to the typing above the photo, K and B, is that Kitchen and Bath Ideas? Is that what that represents, K and B Ideas?**

A. Yes.

**Q. Okay. Now, the date that appears to the right of that, 10/26/07, what is that date?**

A. October -- this is a confirmation that we having October 26, '07, for the next Kitchen and Bath Ideas Magazine.

**Q. So the ad would run following that date; is that what that means?**

A. No. It is just that this is the date

Han

that they produce, send us to confirm. This is the -- going to be placed to the next issue of magazine, of K and B Ideas, at --

**Q. Okay. So the ad would run on a date after October 26, 2007?**

A. Yeah. We have to submit the ad to the magazine, you know, so -- before that, our media company will confirm with us, this is the ad you want to use for that magazine.

**Q. Okay. Thank you.**

**So, is it safe to say that when a date like that appears on one of these sheets, that date either references a date the ad ran, or a date in advance of the ad running?**

A. The date in advance.

Usually they require a few months of -- of time to -- before you actually showing up in the magazine shelf.

**Q. Okay. Thank you.**

MR. SCHROEDER: Let me mark this next document as Defendant's Exhibit 18.

(CD dated April 30, 2007, with Artisan product logos, spec sheets, was marked Defendant's 18 for identification, as of

Han

this date.)

**Q. Can you tell me what appears in this document.**

A. It's a CD that produce for -- for us, or by us, with our product logos, spec sheets.

**Q. Okay. And there's a date, April 30, 2007. You see that on the top?**

A. Yes.

**Q. What would that date signify?**

A. The date we produced.

**Q. Okay. Were there earlier versions of this CD?**

A. No. I don't think. We didn't started to use CD as our catalog until probably this last year.

**Q. Are these CDs distributed to your various dealers?**

A. Yes.

**Q. How do they use these CDs?**

A. CDs, if they don't have a catalog or they just want to show to the customer on the computer, brochure or stuff like that, they use the CD.

**Q. Okay. Thank you.**

**Han**

MR. SCHROEDER: Mark the next document as Defendant's Exhibit 19.

And John, that's Bates Number 52.

(Artisan thank you note, Bates-stamped 52, was marked Defendant's 19 for identification, as of this date.)

**Q. What is that document, or what do I see in this document?**

A. "Thank you for selecting Artisan." Basically a thank you note either placed inside of the sinks when we sell it, or in brochure or something.

**Q. Okay.**

A. Just as a thank you note.

**Q. Okay. So would these appear inside of a sink that is packaged in a box?**

A. Could be. In a certain period of time, yes.

**Q. Do you currently put these thank you notes inside your sink boxes?**

A. I'm not sure.

**Q. Okay.**

MR. SCHROEDER: Go ahead and mark this as Defendant's Exhibit 20. And that's

Han

Bates Number 94.

(Artisan brochure, Bates-stamped 94, was marked Defendant's 20 for identification, as of this date.)

**Q. Mr. Han, the document before you, can you tell me what this is?**

A. It's our brochure.

**Q. Okay. Do you know from looking at it what the date on this brochure is?**

A. I don't.

**Q. If you look in the upper right-hand corner, does that signify a date, 19.3-2000?**

A. No. This is the ASME standard.

**Q. Okay.**

MR. SCHROEDER: Mark the next two documents as Defendant's 21 and 22. And their Bates numbers are 97 and 98.

(Shipping label, Bates-stamped 97, was marked Defendant's 21 for identification, as of this date.)

(Document Bates-stamped 98 was marked Defendant's 22 for identification, as of this date.)

**Q. Mr. Han, these two sheets in front of**

**Han**

**you, can you tell me what they are?**

A. This is a label, a shipping label.

**Q. You're referring to Defendant's Exhibit 21?**

A. Yes.

**Q. Okay.**

A. And that's a shipping label, which put it outside of the box, to identify the sink.

We put it.

**Q. Okay.**

**And Defendant's 22?**

A. Basically, we ask ETemplate, a well-known company that -- in the industry to produce templates, stuff like that, to help us to produce a -- a digital template for CNC machines to cut out the sink hole. So they produce a -- a -- exact measurement of our sink cutout.

**Q. Now, when would you use such a system like that?**

A. Oh, basically, probably All Granite or any other, you know, companies that use a CNC machines, and basically they will cut out -- use a measurement, digital template, to cut out the

Han

sink, to cut out the countertop.

And by having them, and there's a digital template of our sinks, and they can drop right into the cutout. So basically the -- when you cut out the whole countertop, the machine will automatically cut out the sink, where does it need to be, and they do a very good, precise measurement of the cutouts.

**Q. Is the cutout size the same for every sink?**

A. Basically you -- the -- each sink has a different -- same model should have the same template.

**Q. Okay. Thank you.**

MR. SCHROEDER: And mark the next document as Defendant's 23. And that's Bates 101.

(Document Bates-stamped 101 was marked Defendant's 23 for identification, as of this date.)

**Q. Mr. Han, can you tell me when this document was created, if you know?**

A. I don't know when it is exactly produced. I don't know.

Han

**Q. It has your Newark, New Jersey, address, so would it have to have been after you moved to New Jersey in 2007?**

A. Right, yes.

**Q. Okay. Okay. Thank you.**

MR. SCHROEDER: The next document will be marked as Defendant's 24. And I believe it comprises these two pages, which I don't have stapled together. Maybe I can clip them together.

(Advertisement and feature article were marked Defendant's 24 for identification, as of this date.)

**Q. Let me first ask, is that correct in that these two pages belong together?**

A. This is the ad itself. And then with the trends stuff as the feature. So it's a reproduction of the ad, and this is the feature article.

**Q. Okay. Do you know when this ad originally ran?**

A. I don't remember. It says 16 gauge.

**Q. Again, if you look at the ad, on the second page there's a New Jersey phone number.**

Han

**Would that be an indication? Would it have run after you moved to New Jersey?**

A. This ad has been produced, reproduced again, because this indicates a 16 gauge, and I think the first one we run on trend is 2006, with a different version of it.

But this particular one, yes, it's running 2007.

**Q. Okay. Thank you.**

MR. SCHROEDER: Going to mark the next document -- I'll have to use my original copy, I see the date was cut off of the other copy -- as Defendant's 25. And it's Bates Number 186.

(Advertisement Bates-stamped 186 was marked Defendant's 25 for identification, as of this date.)

**Q. Mr. Han, we've marked what's depicted as Bates Number 186 as Defendant's 25.**

**Now, from my review of all these advertisements, this document appears to have the earliest date.**

**If you look on the --**

A. Uh-huh.

Han

**Q. -- right-hand column, on the bottom it says June 2006.**

A. Right.

**Q. Okay. Do you have any material dated earlier than June of which depicts either the Artisan mark or the fleur-de-lis logo?**

A. I don't know.

**Q. Okay. Thank you.**

MR. SCHROEDER: I would like to mark this next document as Defendant's 26.

(Mr. Han's yearly sales document was marked Defendant's 26 for identification, as of this date.)

**Q. Mr. Han, do you recognize Defendant's Exhibit 26?**

A. Yup.

**Q. Can you tell me what that document is.**

A. That's my yearly sales.

**Q. Now, let me just refer you back to Defendant's Exhibit 12, which was your declaration. And in particular, let me refer you to paragraph 10 of your declaration.**

**Okay. On the top of page 5, it states, "Since 2003, sales of Artisan brand sink**

Han

**and related accessories have generated over 20 million in sales."**

A. Okay.

**Q. Okay. Now I want to refer you back to Defendant's 26. I see a total for your 2007 of 19 million.**

**Are there additional sales which don't appear on this summary sheet?**

A. No.

**Q. So the number, through -- let me phrase that.**

**Did you include any sales in 2008, in the 20 million figure that is set forth in paragraph 10 of your declaration?**

A. Could be. I don't know.

**Q. Okay. Who was your biggest customer today?**

**Let's be more specific. Who is your biggest customer in 2007, if you know?**

MR. MALTBIE: Mark this as attorneys eyes only, please.

A. Moore Supply.

**Q. Moore Supply?**

A. Yeah.

Han

**Q. Where are they located?**

A. Texas.

**Q. What kind of company are they?**

A. Plumbing Wholesale.

**Q. Do they carry other brands of sinks besides Artisan, if you know?**

A. They -- they carry -- yes. They carry, but I don't think they're actively promoting.

**Q. Is Moore Supply -- are they significantly bigger in terms of sales than other customers of yours?**

A. Yes, they are, in the distributor level. Not necessarily bigger than other distributors, but they are -- in the distributor level, they're bigger than other customers, smaller customers.

**Q. Can you explain that? I didn't follow that explanation.**

A. They are -- there's many levels of customers.

**Q. Okay.**

A. There's retail customers, there's wholesale customers, and there's distributor

Han

customers, and the distributor customers are substantially, usually larger than the retail customers.

**Q. Does that mean, then, that Moore Suppliers distributes and in turn sells other sinks to other retailers?**

A. That is correct.

**Q. Are they dealing with the purchasing public at that level?**

A. Yes. They also deal with the purchasing public. They have showrooms, stuff like that.

**Q. Have they been your biggest seller for more than the last year?**

A. No. There's others that are similar size.

**Q. Okay.**

A. Sales.

**Q. Okay. Let's go back to 2003, when you first started.**

A. Uh-huh.

**Q. If you recall, who was your largest customer back at that point, in 2003, when you started?**

**Han**

A. I don't know. I have to look into the books.

**Q. Okay. Has your customer base changed much over the years?**

A. Yes.

**Q. It has.**

A. Yeah.

**Q. In terms of increasing, or in terms of changeover?**

A. Everything.

**Q. The way you market sinks, when does a customer see the Artisan word or the fleur-de-lis logo? When is he exposed to that?**

MR. MALTBIE: Objection to form.

A. I don't know -- could be anything. I can't specifically tell.

**Q. Would you see it on a Web site?**

A. We advertising -- we do have a Web site.

**Q. Okay. How about a company which sells your products on Web sites? Would they see the --**

A. Of course.

**Q. -- the logo would --**

**Han**

A. We have companies that sell on the Web sites.

**Q. Okay. Would a customer see the name or logo upon entering a store?**

A. Yes. We have customers displaying our displays, which is have our logos right on top.

**Q. The customers -- rephrase that.**

**The retailers who sell your sinks, who are countertop installers, granite installers of that sort, do they display the Artisan name and the logo along with the sink?**

A. Say that again? I'm sorry.

MR. SCHROEDER: Read back that question.

(The record was read back.)

MR. MALTBIE: Objection to form.

**Q. Do you understand the question?**

A. I don't know, because I don't go to -- very often to customer's showroom.

**Q. Okay. That would be a better question to ask Joe?**

A. That is correct.

**Q. Do you know how many of your retailers sell your sink to the consuming public versus**

**Han**

**give it away as a -- as a freebie?**

MR. MALTBIE: Objection, form.

A. I don't think anybody give away freebies. I mean, they just build the profit into the sink and -- into the job, whatever they do.

**Q. Okay. Let me rephrase that question.**

**Do you know what percentage of your customers charge, specifically charge, for the sale of the Artisan sink?**

A. Our sales training has emphasized how to sell, not on how they give it away.

**Q. Okay.**

**Would Joe have a better idea of which customers are selling and which customers are giving away?**

A. He will.

**Q. Okay.**

THE WITNESS: Excuse me.

**Q. Take a break?**

A. No, no, that's okay.

**Q. Okay. Referring back to your declaration to paragraph 5, you referred to two Web sites, IraWoods.com and USKitchenware.com.**

Han

A. Right.

**Q. Are those two major retailers of your Artisan sinks?**

A. Yes.

**Q. Do they sell a significant part of your sinks?**

A. Yes.

**Q. Would they be in your top ten retailers in terms of the amount of sales?**

A. They're more like the online retailers, basically. They're just selling over the Internet.

**Q. Okay.**

A. They also sell in the showroom, but the significant part of it is over the Internet.

**Q. Do you have an idea where they fit in the scheme of percentage sales? Are they top 10 percent, top 20 percent?**

A. Top -- definitely top 20, and -- but on top of that, I don't know.

**Q. Okay.**

**Are there other Internet -- start all over. Are there other Internet resellers -- one more time.**





Han

**Are there other Internet sellers of Artisan sinks besides Ira Woods and U.S. Kitchenware?**

A. I'm sure there will be on the Internet, but I'm not sure --

**Q. At this time, are they the two significant, major sellers of your product on the Internet, to the best of your knowledge?**

A. Those two are has been the two biggest one that we have.

**Q. Okay. When a company like Ira Woods advertises Artisan sinks on their Web site, who provides the artwork or photographs to the company to show your products?**

A. We authorized they can use our photograph in the literature.

**Q. Okay. So you generally provide the photograph to them depicting your sink.**

A. Yes.

**Q. So when I log onto the Web site and I view the Artisan sink, the photo I'm viewing originated with Artisan.**

A. That's correct. But however, it could be some dealers, they take their own pictures.





Han

That could be also --

Q. Okay.

A. -- possible.

MR. SCHROEDER: Mark the next document as Defendant's 27.

(Printout of the home page of IraWoods.com was marked Defendant's 27 for identification, as of this date.)

**Q. Mr. Han, Defendant's 27, as you'll note, is a printout of the home page of IraWoods.com. Are you familiar with this at all?**

A. No.

**Q. Do you recognize it as being a home page or Web page of IraWoods.com?**

A. From -- yeah. From the printout, yes.

**Q. Okay. Now, let me ask you one question. If you look at the left-hand column, do you see the list of items that are listed there?**

A. Right.

**Q. And there's a section entitled "Kitchen."**

A. Okay.





Han

**Q. And under the word "Kitchen" is kitchen faucets, kitchen sinks, garbage disposers.**

A. Yes.

**Q. To you, what does that mean?**

A. That's categories that they sell. Categories of products.

**Q. Okay. Fine.**

MR. SCHROEDER: Let's go ahead and mark this as Defendant's 28.

("Kitchen sinks" link of a Web site was marked Defendant's 28 for identification, as of this date.)

MR. SCHROEDER: And this next document is Defendant's 29.

("Undermount sinks" link of a Web site was marked Defendant's 29 for identification, as of this date.)

**Q. Okay. And I'll represent to you that as you start clicking through the links on the left-hand column there, Defendant's 28 is a click on the kitchen sinks link, and Defendant's 29 is a click on the undermount sinks link.**

A. Okay.

Han

**Q. And at each of these points the Web page shows representative sinks. I'm not sure which sink they're showing in these photographs.**

**Let's go ahead and mark the next document as Defendant's 30.**

**(Web page concerning undermount double-bowled sinks was marked Defendant's 30 for identification, as of this date.)**

**Q. Mr. Han, Defendant's 30, we have now clicked down to undermount double-bowled sinks. And we start to see, depicted here, some of the Artisan sinks; is that correct?**

A. Right. That's correct.

**Q. Okay.**

**Can you tell from looking at these photographs, are these photographs that were provided by Artisan, or were these photographs that were taken by Ira Woods?**

A. Provided by us.

**Q. Thank you.**

**Looking at Defendant's 30, and the Artisan sinks depicted there on the first page.**

A. Okay.

**Q. Can you tell me if any of these sinks**

**Han**

**depict the fleur-de-lis logo?**

A. From this distance, no.

**Q. Okay. Thank you.**

MR. SCHROEDER: Let's go ahead and mark the next four documents as Defendant's 31, 32, 33, and 34.

(Picture of a sink was marked Defendant's 31 for identification, as of this date.)

MR. SCHROEDER: 32.

(Picture of a sink was marked Defendant's 32 for identification, as of this date.)

MR. SCHROEDER: 33.

(Picture of a sink was marked Defendant's 33 for identification, as of this date.)

MR. SCHROEDER: And 34.

(Picture of a sink was marked Defendant's 34 for identification, as of this date.)

**Q. Okay, let's turn our attention first to Defendant's 31.**

A. Okay.

Han

**Q. This is a click on the actual Artisan sink from the previous page, and we see a larger photograph of the Artisan sink.**

A. Uh-huh.

**Q. Can you tell from that photograph if there's a fleur-de-lis on that sink?**

A. Yes.

**Q. You can.**

A. Yeah.

**Q. You see a fleur-de-lis.**

A. There is an insignia.

**Q. And where do you see that insignia?**

A. Right here.

**Q. Can you describe where in the photograph you're pointing to.**

A. Over here.

**Q. You're pointing to the larger bowl of the two-bowl portion.**

A. Yeah.

**Q. And do you actually see insignia there or --**

A. There's insignia.

**Q. Where it has sort of an orange tint to it, is that the insignia portion you're talking**

**Han**

**about?**

MR. MALTBIE: The black mark.

A. There's a black mark.

**Q. Okay.**

**Let's take a look at Defendant's Exhibit 32. I'll ask you the same question. Do you see the Artisan fleur-de-lis on the sink in Defendant's 32?**

A. This one, no.

**Q. Okay. Let's take a look at Defendant's 33. Do you see the Artisan --**

A. Hold on a second.

**Q. 33.**

A. You were looking at 32. I'm sorry, I wasn't looking at 32.

**Q. Should we go back to 32?**

A. Yeah.

**Q. Let's go back to 32. Do you see the Artisan fleur-de-lis on the sink in Defendant's 32?**

A. No.

**Q. Okay. Now let's turn to --**

A. For the printouts.

**Q. Now let's turn to Defendant's 33. Do**

Han

**you see the Artisan fleur-de-lis on the sink shown in Defendant's 33?**

A. Based on the printout, no.

**Q. Okay. And I'll ask you the same question about Defendant's 34. Do you see a fleur-de-lis on that sink shown in 34?**

A. Based on this printout, no.

**Q. Are you surprised to see Artisan sinks appearing in Ira Woods without a fleur-de-lis logo on them?**

MR. MALTBIE: Objection to form.

A. What did you mean?

**Q. Has the fleur-de-lis logo always been on the Artisan sink, to the best of your knowledge?**

A. Yes, it is.

**Q. And you testified earlier that you -- you supplied these photographs to Ira Woods, for their Web site.**

A. That is correct.

**Q. Do you have any explanation, other than the quality of the photographs, as to why the fleur-de-lis would not be on those sinks?**

A. Based on how they -- how the picture

Han

were taken and how strong is the insignia, has been on the sink, the photo might not show it because of the reflection of the light.

**Q. But now these are the photographs taken by your advertising people?**

A. In order to show a logo strongly, you have to artificially put the logo into the computer when you're taking the picture, because the light does not reflect very well on stainless steel sinks because it's white.

Basically it reflects light and -- if you put a pencil mark on the wall and try to take a picture, you're probably not going to get it, unless you just focus on that mark.

**Q. So if a customer were to purchase one of these sinks that we looked at, it's your testimony that the sink, when it arrives, would have a fleur-de-lis logo on it?**

A. That's correct.

**Q. And to the best of your recollection, there hasn't been any sinks produced without a fleur-de-lis logo on them?**

A. That I don't know.

I can't answer that.

Han

MR. SCHROEDER: Let's mark the next document as Defendant's 35.

(Printout from Ira Woods website was marked Defendant's 35 for identification, as of this date.)

**Q. And this document is also a printout from Ira Woods, but now we're looking at the undermount single bowl sinks. And again, we see a plurality of Artisan sinks.**

A. Uh-huh.

**Q. And let me ask you, again, from looking at these photographs, do you see the Artisan fleur-de-lis on any of these sinks?**

A. You can't see any insignia in any other brands neither, so ... there's no brand -- there's no way you can see any brands on the pictures, if you pay attention.

**Q. Thank you.**

MR. SCHROEDER: Let's go ahead and mark the next three documents as Defendant's 36, 37 and 38.

(Photograph of Artisan undermount single-bowl 16-gauge sink was marked Defendant's 36 for identification, as of

Han

this date.)

(Photograph of a sink was marked Defendant's 37 for identification, as of this date.)

(Photograph of a sink was marked Defendant's 38 for identification, as of this date.)

**Q. Let me turn your attention to Defendant's 36, which represents an Artisan undermount single-bowl 16-gauge sink.**

A. Right.

**Q. And in that photograph, can you see the Artisan fleur-de-lis on the sink?**

A. I think it is over here.

It's here right, a dot mark right here.

Because this sink supposed to put it this way, and shot instead of -- in this way, because the -- the 12-by-14 is not that -- the same. You can put it, lay it out.

**Q. So your testimony is that the fleur-de-lis appears on --**

A. The left.

**Q. -- that end of the --**

Han

A. I think it is on the left there.

**Q. -- of the sink or on the left-hand side of the sink as shown in the photo there?**

A. There's a dark mark right here. Well, it's maybe a dark mark right here.

**Q. Okay. Thank you.**

**Let's take a look at Defendant's 37. I'll ask you the same question.**

A. Where is Defendant's 37?

**Q. Do you see a fleur-de-lis on that sink?**

A. I -- again, the sink was laid differently. You cannot see any insignia on this side. It will be on this side.

**Q. It would be on the left-hand side of that sink?**

A. Yes.

**Q. Okay. Thank you.**

**And let's take a look at the sink shown in Defendant's 38. Can you see a fleur-de-lis on that sink?**

A. Right here.

**Q. Where are you pointing to?**

Han

A. Over here.

**Q. Can you describe that.**

A. It's --

**Q. The section below the faucet?**

A. Yup. Right, just right there. If you blow it up, this picture is, give a little more pixels, yes, because the original pictures has the logo right there.

**Q. Now, let me ask you this question: A consumer logging onto Ira Woods and looking at this sink, would a consumer see a fleur-de-lis, realistically? Would a consumer know there's a fleur-de-lis in any of these sinks?**

MR. MALTBIE: Objection to form.

A. If --

MR. MALTBIE: Answer if you know.

A. My answer is not yes or no. If a customer usually searched for sink, they would type in "Artisan," and they usually have seen our sinks in somewhere, either in showroom as presented by the salesperson or in the print media, has look at our sinks. You know, I want to do a little bit more research on it, and they have been exposed with the logo already.

Han

So, at this time, if they go to Ira Woods and look at Artisan, they were not so concerned about the actual logo anymore on the picture.

**Q. Do you see the logo anywhere else in any of these pages? And feel free to look back on the Ira Woods pages that I've handed to you.**

A. Uh-huh.

**Q. Do you see the logo appearing anywhere else on these Web pages, other than possibly on the sink itself?**

A. I cannot tell you, because the picture's so small and --

**Q. No. Other than the photograph --**

A. If you give me a 20 inches TV monitor, and maybe I can identify it.

**Q. But other than the photograph or the sink, do you see the fleur-de-lis on any of the other printed sections of these pages?**

**Feel free to look back through the pages I handed to you.**

A. Based on the very low pixel, small pictures that you presented, with no resolution whatsoever, it's -- I only can see couple, as I

Han

mentioned. And other than that, I cannot identify the logo due to the low resolution of the photo.

**Q. Okay. But other than the photographs, you don't see the fleur-de-lis on the Web page itself for X, the title of the sink. Does that contain the fleur-de-lis where it describes the sink as an Artisan 82321-DS-S?**

A. I believe there's no need to put logo in there, because American Standard never put their logo there. Blanco never put their logo there. So it's industry standard, on the Web site, you just put the name of the item that you are trying to sell and reduce the -- the pixel that you have to load up to the Web site.

**Q. Okay.**

A. If you put all the logos there, and this -- this page probably takes 20 minutes to load up.

**Q. Okay. Thank you.**

A. All right.

MR. SCHROEDER: Let's mark the next document as Defendant's 39.

(Printout from the Web site of

Han

USKitchenware.com was marked Defendant's 39 for identification, as of this date.)

MR. SCHROEDER: I'll represent this document is a printout from the Web site of USKitchenware.com.

A. Okay.

**Q. Again, on the left-hand side, we see a column shows the selection of products --**

A. Right.

**Q. -- sold on this Web site, correct?**

A. Uh-huh.

**Q. One of those products being kitchen sinks.**

A. All right.

**Q. Okay.**

**Now, when we click through, we get to a page depicting Artisan sinks, and or let's mark that document as Defendant's Exhibit 40.**

**(Web page depicting Artisan sinks was marked Defendant's 40 for identification, as of this date.)**

**Q. Mr. Han, I'll ask you to look at what's marked as Defendant's 40. And in particular, to look at the Artisan sinks, and to**

**Han**

**tell me if you see the fleur-de-lis logo on any of those sinks.**

A. Yes. A 2120 D 9, you see a logo right there.

**Q. And where do you see the logo in that photograph?**

A. Right here.

**Q. Can you describe that for the --**

A. See right here.

**Q. Describe that for the court reporter where are you pointing.**

A. The center of the sink, on the -- against the wall.

**Q. Toward the back section. Up near the top of the sink?**

A. Yeah.

**Q. Okay. And do you see the fleur-de-lis logo in any of the other sinks?**

A. Based on the picture, no.

MR. SCHROEDER: Let's mark this next document as Defendant's 41.

(Two-page printout from the Web site of USKitchenware.com was marked Defendant's 41 for identification, as of this date.)

Han

**Q. Defendant's 41 is two-page document, again from U.S. Kitchenware.**

A. Right.

**Q. It depicts an ENX undermount large single-bowl sink, and the second page it shows an enlarged photo of the sink.**

A. Uh-huh.

**Q. Now, when you look at this photo, do you see a logo on the sink shown in this photo?**

**Let me ask you the question, if you look back, Exhibit 40, and also an ENX picture, and show it right here, did you see a logo right here?**

A. In the middle sink, you do not see a logo, no.

You see the logo, though, in the sink on the left, which is the one --

Depends on how they take the picture, and the lighting, all that kind of stuff, you may see or may not see.

**Q. Now, as you say, it depends on the lighting whether or not the logo is visible. Since these photographs were provided by Artisan, why wouldn't Artisan have taken more**

**Han**

**care to ensure that the fleur-de-lis was visible in the photographs?**

MR. MALTBIE: Objection to form.

A. I don't know why. I'm not the one who can produce it, the pictures.

**Q. Okay. Thank you.**

**We've spoken earlier about Artisan selling 16-gauge sinks. Now, it's my understanding Artisan also sells 18-gauge sinks; is that correct?**

A. That's correct.

MR. SCHROEDER: And let's mark this next document as Defendant's 42.

(Customer proposal prepared by Artisan Manufacturing was marked Defendant's 42 for identification, as of this date.)

**Q. Do you recognize this document, Mr. Han?**

A. No.

**Q. Is it a document originating with Artisan, to the best of your knowledge?**

A. Could be. Some draft.

**Q. Okay. The first sentence that describes Artisan Manufacturing as offering**

Han

**premium quality sinks in an 18-gauge thickness --**

A. Excuse me, hold on a second. This piece of literature is for a specific customer as a proposal. Has not gone onto the market because the sink model, everything, doesn't match. It is just for a specific customer, and when we do a proposal for them, and we make this sheet.

**Q. Okay.**

A. So....

**Q. Has this sink ever been sold?**

A. No.

**Q. Do you believe that you could make a quality sink in an 18-gauge thickness?**

A. Depends on how you define quality. Some people think Toyota is quality, but some people think Mercedes is quality. So depends on what your interpretation of quality.

**Q. Okay. How would you define quality in terms of an 18-gauge sink?**

A. I would define it as acceptable.

**Q. Okay. Any other characteristics that would --**

Han

A. That's it.

**Q. Okay.**

MR. SCHROEDER: All right. Let's mark the next two documents as Defendant's 43 and 44.

(Paragraph in which Kohler describes a professional kitchen collection was marked Defendant's 43 for identification, as of this date.)

(Document prepared by Kohler was marked Defendant's 44 for identification, as of this date.)

**Q. Now, we spoke a little bit earlier about some other brand. We mentioned Kohler. I don't know if we mentioned Franke.**

**You are familiar with the Kohler brand, I understand.**

A. Yes.

**Q. Are you familiar with Franke sinks as well?**

A. Yes.

**Q. Let's just take a look at Defendant's 43.**

**And in that first paragraph, Kohler**

Han

**describes a professional kitchen collection as being crafted from durable Kohler cast iron and high-quality 18-gauge Kohler stainless steel.**

**In your opinion, does Kohler produce a quality 18-gauge sink?**

MR. MALTBIE: Objection to form.

A. What do you mean by quality 18-gauge? I don't understand.

**Q. Well, Kohler's advertisements describe their sink as a high-quality 18-gauge Kohler stainless steel.**

A. Right.

**Q. In your opinion, is a Kohler 18-gauge sink a quality sink?**

MR. MALTBIE: Objection to form.

A. If I never heard of a Mercedes-Benz, I'd probably think Honda is the best car in the world. So depends on what did you know and what you don't know.

**Q. Do customers perceive Kohler as a quality sink?**

MR. MALTBIE: Objection to form.

A. They perceive Kohler as a quality brand.

Han

**Q. Okay. Let me ask you to turn to the second -- strike that.**

**Let me ask you to refer to the second document we marked as Defendant's 44. You mentioned earlier you are familiar with the Franke brand sinks?**

A. Yeah.

**Q. And Franke, according to this, is a Swiss manufacturer of sinks?**

A. Sure.

**Q. And you agree with that, they are Swiss manufacturers?**

A. Yes.

**Q. And if I ask you to turn to the second page of this document, Franke advertises that they also produce 18-gauge stainless sinks. And they talk about having the highest percentages of chromium and nickel, for deep, rich glow.**

**Do you agree with that assessment of their sinks, to the best of your knowledge?**

MR. MALTBIE: Objection.

A. Assessment of what?

**Q. That they have the highest percentage of chromium and nickel. If you know.**

Han

A. I don't know. I never tested.

**Q. That's fine. Do you believe that customers perceive Franke sinks as high-quality sinks?**

A. Again, probably through a salesperson's mouth, they perceive Franke as a quality brand.

**Q. Okay. Thank you.**

**Do you have any reason to believe that All Granite branded sinks are inferior to any of these sinks we discussed, whether it be the Kohler, the Franke, or the Artisan sink?**

A. What did you mean?

MR. SCHROEDER: Read back the question.

(The record was read back.)

A. I don't know that question. Probably ask Kohler, will be better.

I don't know enough to....

**Q. Okay. That's fine. Have you ever told anyone outside of your company that All Granite branded sinks are inferior to, for example, Artisan sink?**

A. No.

Han

**Q. To the best of your knowledge, have your salespeople ever told anyone that All Granite brand sinks are inferior to Artisan sinks?**

A. I don't know that. You have to ask them.

**Q. Thank you.**

**Let's take a look back at your declaration there on page 1. There's a caption, "Artisan and Its Valuable Trademarks."**

**And if we turn to paragraph 7, we actually discuss which trademarks are included in the term "Artisan trademarks."**

**You see that?**

A. All right.

**Q. Now, you mentioned earlier that you chose the name Artisan after visiting a restaurant, I believe you said in --**

A. Artisinal.

**Q. And the restaurant was located?**

A. 33rd Street, Park Avenue.

32nd Street, Park Avenue.

**Q. Are you aware of any other uses of the name Artisan in the trade?**

Han

MR. MALTBIE: Objection to form.

A. I don't know.

**Q. Are you aware of any uses of Artisan on similar products?**

A. Not aware of.

MR. SCHROEDER: Let's mark the next four documents as Defendant's 45, 46, 47, 48.

(Printout of a Web page from Universal.AKB was marked Defendant's 45 for identification, as of this date.)

(Document which refers to an artisan drain basket was marked Defendant's 46 for identification, as of this date.)

(Document referring to an artisan colander manufactured by Franke was marked Defendant's 47 for identification, as of this date.)

(Document referencing an artisan white synthetic cutting board manufactured by Franke was marked Defendant's 48 for identification, as of this date.)

**Q. Let me refer your attention to what we marked as Defendant's Exhibit 45, and I'll**

Han

**represent that is printout of a Web page from Universal.AKB, an appliance and kitchen center.**

**And I'll refer your attention to the upper portion of that page. It refers to a Franke Artisan inset sink. Do you see that?**

A. Right.

**Q. Have you ever seen that before?**

A. No.

**Q. You've never seen -- let me rephrase that.**

**You've never been advised in the past that Franke sells an Artisan inset sink?**

A. No.

**Q. All right. Let me refer your attention to the next page of Defendant's 45, which is a detailed description of the Franke Artisan inset sink, ARX-630.**

**Have you ever seen that description before?**

A. ARX-630?

**Q. Correct.**

A. Okay. What about it?

**Q. Have you ever seen that reference before, that sink before?**

Han

A. No.

Q. And likewise, on the following page, the ARX 670, have you ever seen a reference to that sink before?

A. No.

Q. So prior to today, you were unaware of that Franke was selling an Artisan inset sink?

A. No.

Q. Let me rephrase that question.

Prior to today -- prior to today, you were unaware that Franke was selling an Artisan inset sink, correct?

A. No.

Q. You were unaware, correct?

A. No. Not aware.

Q. Okay. Let's take a look at what we marked as Defendant's 46, which refers to an artisan drain basket.

Is that manufactured by your company?

A. No.

Q. It's manufactured by Franke, correct, according to the --

A. That's correct.

Q. And likewise, on Defendant's 47, the

Han

artisan colander, is it manufactured by Franke?

A. Yes.

Q. And Exhibit 48, the artisan white synthetic cutting board, it's manufactured by Franke, correct?

A. That's correct.

Q. Were you aware of any of these products prior to today?

A. No.

Q. Thank you.

MR. SCHROEDER: Mark the next document as Defendant's 49.

(Trademark registration of Artisan issued to Buttura & Sons, Inc., was marked Defendant's 49 for identification, as of this date.)

Q. Mr. Han, what I'm showing to you is a trademark registration issued to a company called Buttura & Sons, Inc., located in Vermont.

A. Uh-huh.

Q. The mark that's been registered is Artisan, with the design appearing next to it.

A. Okay.

Q. And the goods described in the

Han

registration are granite monuments, granite tombstones, mausoleums, granite -- granite grave markers of granite.

Were you aware of this registration prior to today?

A. No.

Q. Have you ever come across this mark in the marketplace?

A. No.

Q. Thank you.

MR. SCHROEDER: Let's mark this next document as Defendant's 50.

(Registration issued on December 7, 1999, for the mark, Artisan, was marked Defendant's 50 for identification, as of this date.)

Q. Again, what you have before you Mr. Han is a registration issued on December 7, 1999, for the mark, Artisan, as used in connection with cleaners for use on marble, granite and other stone or tile products.

A. Okay.

Q. Have you ever come across this mark in the marketplace?

Han

A. No.

Q. Have you ever seen anyone using this mark?

A. No.

Q. Prior to today, you were unaware of this mark being used in the marketplace.

A. No.

Q. Thank you.

MR. SCHROEDER: Let's mark the next two documents as Defendant's 51 and 52.

(Printout from the trademark database showing a pending application for the mark, Artisan, used in connection with ceiling fans, applied for by Hunter Fan Company, was marked Defendant's 51 for identification, as of this date.)

(Notice of allowance for the application for the Artisan mark was marked Defendant's 52 for identification, as of this date.)

Q. Mr. Han, Defendant's 51 is a printout from the trademark database showing a pending application for the mark, Artisan, used in connection with ceiling fans, which has been

Han

**applied for by Hunter Fan Company.**

A. Right.

**Q. Are you aware -- rephrase that. Were you aware of this application prior to today?**

A. No.

**Q. Now, Defendant's 52 is a notice of allowance for that same application. To the best of your knowledge, did Artisan Manufacturing Company take any action against this pending application?**

MR. MALTBIE: Objection to form.

**Q. You can answer the question if you understand it.**

MR. MALTBIE: It's a 1B application. There was a 1B application. I don't know there would be any opportunity for Artisan to take any action against this mark at this point.

MR. SCHROEDER: Other than an opposition proceeding.

MR. MALTBIE: I don't think you can take an opposition proceeding against an ITU application.

**Q. In terms of your answer, was there any**

Han

**action taken by Artisan Manufacturing against this application, to date?**

A. I have -- not aware of that mark.

**Q. Fair enough.**

MR. SCHROEDER: Let's mark the next two-page document as Defendant's 53.

(Two-page Web page printout regarding a company called Artisan Manufacturing located in Oakland, California, was marked Defendant's 53 for identification, as of this date.)

**Q. Mr. Han, Defendant's 53 is a Web page printout referring to a company called Artisan Manufacturing located in Oakland, California. And page 2 provides a description about the company.**

A. Okay.

**Q. Have you ever heard of this company before?**

A. No.

**Q. Have you ever encountered this company in the marketplace?**

A. No.

**Q. Okay. Thank you.**

Han

MR. SCHROEDER: Go ahead and mark one more document here. Defendant's 54.

(Registration from the United States Patent and Trademark Office for a service mark and trademark by Artisan Machine, Inc., for the word "Artisan" Was marked Defendant's 54 for identification, as of this date.)

**Q. Mr. Han, what's been marked as Defendant's 54 is another registration from the United States Patent and Trademark Office for a service mark and trademark for the word "Artisan." The owner of the mark is Artisan Machine, Inc. --**

A. Right.

**Q. -- in Indiana. And the mark is directed to grinding machines for rubber processing and recycling, machine parts, namely millstones, machine parts, namely bearing housings.**

A. Right.

**Q. Have you ever seen this mark before?**

A. No.

**Q. Have you ever encountered it in the**

Han

**marketplace?**

A. No.

**Q. So prior to today, you were unaware this registration existed.**

A. No.

**Q. You were unaware prior to today that this registration existed.**

A. That is correct.

**Q. Thank you.**

MR. SCHROEDER: We can take a five-minute break. Stretch our legs.

MR. MALTBIE: Sure.

(Recess from 3:58 to 4:04.)

BY MR. SCHROEDER:

**Q. Let me refer you back to your declaration, Exhibit 12. Okay. And let me refer you to paragraph 7.**

**Actually, paragraph 7 and 8.**

**Okay. Which list the various trademarks/applications which are owned by Artisan.**

A. Right.

**Q. Okay. And just to make this easier, we'll mark one more document as Defendant's 55**

Han

which is the application for the fleur-de-lis, Application Number 77,316,683, for sinks.

(Application Number 77,316,683 for the fleur-de-lis for sinks was marked Defendant's 55 for identification, as of this date.)

Q. Who authorized the filing of this trademark application, if you know?

A. Me.

Q. Okay. And if I direct your attention to the left-hand column, do you see where it says "filing date"?

A. Uh-huh.

Q. And after that is October 30, 2007.

A. Right.

Q. That represents the date on which this application was filed, correct?

A. Correct. File or -- I think it's just a modification.

Q. Okay. Based on your testimony earlier today and the allegations in the various papers, and even as claimed here in this application, it's Artisan's position that usage of this fleur-de-lis goes back to 2003; is that correct?

Han

A. Yes.

Q. Why did Artisan wait until 2007 to file this trademark application?

MR. MALTBIE: Objection to form.

A. I think we -- in 2003, we filed a trademark application already.

Q. For the mark, Artisan, correct?

A. Yes, everything, the word and then the design.

Q. Let me refer you back to your declaration, paragraph 7. The first list marked there is Artisan.

A. Right.

Q. That is your originally filed trademark.

A. Okay. Right.

Q. Now, that mark is only for the word "Artisan."

A. Okay.

Q. Now, in 2007, this fleur-de-lis application was filed.

A. The fleur-de-lis also filed the same year, right. If you look down.

Q. What that says is, "First use,

Han

August 2003." So the application is filed in 2007, but you claim usage back to 2003.

A. Fleur-de-lis, we -- also has file. We probably can ask the previous attorney to provide the data, the letters that we go back and forth, that we asked -- I asked them to file both, probably. If they still keep the record.

Q. Who were your previous attorneys?

A. I can give you the name. I don't remember.

Q. I may have asked you this. Who authorized the filing of this trademark application? Was that you?

A. Yes.

Q. Was that done in response to the allegations made against All Granite?

MR. MALTBIE: Objection to form, and only answer if it's unrelated to something you discussed with counsel.

A. Again, the -- all the trademarks and the word was filed by the time the -- when it first use.

Q. Thank you.

MR. SCHROEDER: Let's mark this next

Han

document as Defendant's 56.

(All Granite logo was marked Defendant's 56 for identification, as of this date.)

Q. Mr. Han, do you recognize the logo that's shown in what's been marked as Defendant's 56?

A. Yes.

Q. What logo is that?

A. That's All Granite's infringing logo.

Q. Now, you have also in front of you a depiction of your fleur-de-lis shown there on Defendant's 55.

A. Right.

Q. Do you believe the logo, the All Granite logo shown in Defendant's 56, is similar to the logo shown in Defendant's 55?

A. Yes.

Q. Can you point to any characteristics which make the logo similar.

A. The flower over here. The -- the pattern that goes. You know, it's the same.

Q. Any other --

A. The design -- the design elements of

Han

the whole thing is similar.

**Q. Okay. Any particular characteristics?**

MR. MALTBIE: Objection, form.

A. I don't know.

**Q. Okay.**

**Do you recognize the logo which appears in Defendant's 56 as representing and/or depicting a crown?**

A. To me, it is the -- they tried to produce a similar logo that when you not paying close attention, standing 5 feet, 10 feet above it, you wouldn't distinguish what it is.

**Q. So back to my question. Do you see that logo as a crown?**

A. Modified it for the fleur-de-lis logo.

**Q. I'm sorry?**

A. Modified fleur-de-lis logo.

**Q. Modified fleur-de-lis logo.**

A. Yeah.

**Q. Do you know whether fleur-de-lis logos are common in the marketplace?**

A. Say it again?

MR. SCHROEDER: Read back my question, please.

Han

(The record was read back.)

MR. MALTBIE: Objection to form.

A. I'm not a trademark scientist. I don't know.

**Q. Thank you.**

MR. SCHROEDER: Let's mark this next document as Defendant's 57.

(Printout from Wikipedia for the term "fleur-de-lis" was marked Defendant's 57 for identification, as of this date.)

**Q. Are you familiar with Wikipedia, that appears on the Internet?**

A. Yes.

**Q. Okay. Defendant's 57 is a printout from Wikipedia for the term "fleur-de-lis."**

**Are you familiar with the history of fleur-de-lises?**

A. Not much.

**Q. Who chose the fleur-de-lis design, if you know?**

A. It was one of the suggestions of the designers.

**Q. That's right. You mentioned earlier that it was a designer, a Chinese designer that**

**Han**

**you worked with.**

A. Right.

**Q. Correct.**

**If you compare the fleur-de-lis shown here on the first page of this Wikipedia article to the fleur-de-lis shown in your trademark application, do you believe this fleur-de-lis is similar to your fleur-de-lis?**

A. How did you define similar? Means either different or same or --

**Q. Do you believe they look the same?**

A. They're not look the same.

**Q. Do you believe a consumer would find these two logos to be similar?**

MR. MALTBIE: Objection. Form.

A. You can ask consumers. I can't answer for them. Different cultural backgrounds have different understanding.

**Q. But in your mind, the logos look different.**

MR. MALTBIE: Objection to form.

A. In my mind. I don't know.

**Q. Okay. Fair enough.**

**Are you aware of any other companies**

**Han**

**using a fleur-de-lis logo on similar products?**

A. Similar products? No.

MR. SCHROEDER: Let's mark this next document as Defendant's 58.

(Fleur-de-lis design was marked Defendant's 58 for identification, as of this date.)

**Q. Mr. Han, are you familiar with the company, Latoscana?**

A. I heard of them, yes.

**Q. And do you know that they market and sell faucets?**

A. Yes.

**Q. And if I refer you back to Defendant's 27, which is the Ira Woods Web page, we saw that Ira Woods, for example, carries both faucets and sinks, correct?**

A. Yes.

MR. SCHROEDER: That was 27.

**Q. Now, you see the emblem that appears above the word "Latoscana"?**

A. Uh-huh.

**Q. And you see the fleur-de-lis design that appears in that emblem?**

Han

A. Yes.

**Q. Do you believe that fleur-de-lis design is similar to your fleur-de-lis design which appears in the application there as Defendant's 55?**

A. Okay. They have a horse in it.

**Q. Okay. That is a difference. I agree. Let's look at the fleur-de-lis portion. Is the fleur-de-lis similar to the fleur-de-lis in your application?**

MR. MALTBIE: Objection, form.

A. You aware of the horse more than the fleur-de-lis.

**Q. Okay. Now, when you look at the fleur-de-lis, though, is the fleur-de-lis similar to your fleur-de-lis?**

A. Some similarity.

**Q. Do you notice any differences?**

A. They got three -- three branches, and there's one, two, three -- I got five. All Granite's got five, too. One, two, three, four, five.

**Q. Okay. Any other differences between the fleur-de-lis shown there on Defendant's 58**

Han

**and the fleur-de-lis shown on your application?**

A. Other than that, no.

MR. SCHROEDER: Let's mark this next document as Defendant's 59.

(Design and the word "Aquadis" was marked Defendant's 59 for identification, as of this date.)

**Q. Mr. Han, are you familiar with the company, Aquadis?**

A. Yes.

**Q. And do you know that they sell faucets?**

A. Yes.

**Q. Okay. And if you look at the mark which is registered, you see a flower design appearing over the letter I in Aquadis.**

MR. MALTBIE: Objection to form.

A. That's not a flower design.

**Q. Okay. How would you describe that design?**

A. A spring.

**Q. A spring?**

A. A water spring. That's it.

**Q. Okay. Do you feel that design which**

Han

**appears over the letter I is similar to your fleur-de-lis logo?**

A. No.

**Q. Can you describe the difference between your two designs.**

A. As said, it doesn't look like a fleur-de-lis at all.

**Q. Any particular differences you can point to?**

MR. MALTBIE: Objection to form. It's also described as stylized splash design.

**Q. Okay. Can you describe any differences yourself, though, Mr. Han, between the two?**

A. There is no difference.

**Q. I'm sorry?**

A. There is no difference, I don't think so, between these judgment and my judgment.

MR. MALTBIE: He means, can you -- is there any -- can you describe the difference between this and your design.

A. This and my design? This is a spring, it's not a fleur-de-lis. It doesn't relate to fleur-de-lis at all.

Han

**Q. Thank you. Are you aware of any of the manufacturers using crown logos in the marketplace on similar-type products?**

A. No.

MR. SCHROEDER: Let's mark this next document as Defendant's 60.

(Logo for Whitehaus was marked Defendant's 60 for identification, as of this date.)

**Q. Mr. Han, are you familiar with Whitehaus?**

A. Right.

**Q. And they're a manufacturer of sinks, correct?**

A. Yes.

**Q. Have you ever seen that logo?**

A. Yes.

**Q. The crown logo before? You have.**

A. Yes.

**Q. And do you believe that crown logo is similar to your fleur-de-lis logo?**

A. No.

**Q. No?**

Han

A. It's not similar.

**Q. And can you describe for me the differences between that crown logo and the fleur-de-lis logo, if you can?**

MR. MALTBIE: Objection. Form.

A. It doesn't look like a flower at all.

**Q. What does it look like?**

A. A crown.

**Q. Okay. Thank you.**

MR. SCHROEDER: Let's mark this next two-page document as Defendant's 61.

(Trademark registration and logo for Kindred was marked Defendant's 61 for identification, as of this date.)

**Q. Mr. Han, are you familiar with the manufacturer, Kindred?**

A. Yes.

**Q. And they manufacture sinks, correct?**

A. Right.

**Q. Now, it's hard to see on this first page, which depict the trademark registration, but if you look on page 2, you see a logo next to the word "Kindred." Do you see that?**

A. Yes.

Han

**Q. How would you describe that logo?**

A. It's a crown logo.

**Q. Okay. Is that logo similar to your fleur-de-lis logo?**

A. No.

**Q. Can you describe for me differences between that crown logo and your fleur-de-lis logo.**

MR. MALTBIE: Objection to form.

A. One is a crown, one is flower.

MR. SCHROEDER: Let's mark this next document as Defendant's 62.

(Document pertaining to the company R Royal USA was marked Defendant's 62 for identification, as of this date.)

**Q. Mr. Han, are you familiar with the company, R Royal USA?**

A. No.

MR. SCHROEDER: Please mark this next document as Defendant's 63.

(Printout of Web page from RoyalSink.com was marked Defendant's 63 for identification, as of this date.)

**Q. Defendant's 63 is a Web page from**

Han

**RoyalSink.com.**

**Does this refresh your recollection at all? Do you -- are you familiar with the Royal USA brand?**

A. Say it again.

**Q. Have you ever seen that brand before? Are you familiar with this brand?**

A. I heard of it, but I'm not familiar with it.

**Q. Okay. Let's take a look at the logo that appears at the top of the Defendant's 63.**

A. Okay.

**Q. In your opinion, is that logo similar to your fleur-de-lis logo?**

A. No.

**Q. Can you describe for me the difference between that logo and your logo.**

A. Yeah. The crown got an R.

**Q. Any other differences?**

A. No.

**Q. Thank you.**

MR. SCHROEDER: Let's mark this document as Defendant's 64.

(Trademark registration to the

Han

company, RAK Verticals, was marked Defendant's 64 for identification, as of this date.)

**Q. Mr. Han, Defendant's 64 is a trademark registration to the company, RAK Verticals.**

A. Uh-huh.

**Q. Have you ever heard of that company?**

A. No.

**Q. Have you ever seen that logo in the marketplace?**

A. No.

**Q. The logo is directed to plumbing -- let me rephrase that.**

**The trademark application is directed to plumbing fixtures, namely bathroom sinks, bathtubs, shower trays, et cetera.**

**And in your opinion, is this logo similar to your fleur-de-lis logo?**

A. No.

**Q. Can you describe for me the differences between this logo and your fleur-de-lis logo.**

MR. MALTBIE: Objection to form.

**Q. If any.**

Han

A. It's a -- totally irrelevant. This is a crown logo.

**Q. Okay. And versus your fleur-de-lis logo.**

A. Right.

**Q. Okay. Thank you.**

MR. SCHROEDER: Let's mark this next document as Defendant's 65.

(Trademark registration for RLI and design, for the company Top Care, Inc., was marked Defendant's 65 for identification, as of this date.)

**Q. Mr. Han, Defendant's 65 is a trademark registration for RLI and design, for the company Top Care, Inc.**

**Are you familiar with that company at all?**

A. No.

**Q. Have you ever seen this logo in the marketplace?**

A. No.

**Q. In your opinion, is this logo similar to the fleur-de-lis logo?**

A. No.

Han

**Q. Can you describe for me differences between this logo and your logo?**

MR. MALTBIE: Objection to form.

A. RLI --

**Q. Any other differences?**

A. This doesn't look similar at all.

**Q. Okay. Thank you.**

MR. SCHROEDER: Let's mark this document as Defendant's 66.

(Trademark registration for a logo to Richmond Foundry, Inc., a Florida company, was marked Defendant's 66 for identification, as of this date.)

**Q. Mr. Han, Defendant's 66 is a trademark registration for a logo to Richmond Foundry, Inc., a Florida company.**

**Are you familiar with that company at all?**

A. No.

**Q. Have you ever seen that logo in the marketplace?**

A. No.

**Q. Okay. The goods identified in the application are plumbing equipment, namely metal**

Han

**soil pipe fittings.**

**In your opinion, is this logo similar to your fleur-de-lis logo?**

A. No.

**Q. Can you describe for me the differences between this logo and your fleur-de-lis logo.**

MR. MALTBIE: Objection to form.

A. This is totally different.

**Q. Can you be more particular, more specific?**

MR. MALTBIE: Objection to form.

A. This logo looks to -- more like a Chinese, oh -- what's the -- currency, instead of a fleur-de-lis.

**Q. Okay. Thank you.**

A. Any more?

MR. SCHROEDER: Let's do this. Let's take a short, two-minute break. I mean, this is -- do a once through, and then I think I'm about done.

(Recess from 4:32 to 4:37.)

BY MR. SCHROEDER:

**Q. Just one final point. Mr. Maltbie**

Han

**handed me a few documents during an earlier break, which are Bates-stamped 237 to 246.**

**Mr. Han, are you familiar at all with these documents?**

A. I looked over it this morning.

**Q. Okay. Do you have any firsthand knowledge, or should I be asking Joe about these documents?**

A. It would be asking him better than me.

**Q. Were you involved in the preparation of the declaration of Alice Anderson?**

A. No.

**Q. Was Mr. Maltbie involved? Let me rephrase that.**

**Was Joe involved in the preparation of the declaration of Alice Anderson?**

A. I -- not sure. I think, yes, but....

MR. SCHROEDER: Okay. I have nothing further. Thank you for coming in today and answering questions. And that concludes the deposition.

(Continued on following page to include jurat.)